Filed 8/29/14

<u>CERTIFIED FOR PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CITIZENS FOR THE RESTORATION OF L STREET,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>CITY OF FRESNO et al.,<br><br>    Defendants and Appellants;<br><br>FFDA PROPERTIES, LLC et al.,<br><br>    Real Parties in Interest and Appellants. | F066498<br><br>(Super. Ct. No. 11CECG04172)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County. Jeffrey Y. Hamilton, Jr., Judge.

Brandt-Hawley Law Group and Susan Brandt-Hawley for Plaintiffs and Appellants.

Stoel Rives, Timothy M. Taylor, Carissa M. Beecham; Douglas T. Sloan and Francine M. Kanne for Defendants, Real Parties in Interest and Appellants.

-ooOoo-

## INTRODUCTION

The City of Fresno (the City) approved a residential infill development project in downtown Fresno to build 28 two-story townhouses. The project site contained vacant parcels and two lots with houses built in the early 20th century. A citizens group interested in historical resources in downtown Fresno challenged the City's approval of the townhouse project, particularly its decision to issue demolition permits for the two houses. The trial court decided the City violated certain procedural requirements of the California Environmental Quality Act (CEQA)[1] in approving the project, but applied the correct legal standards in determining the two houses were not "historical resources" protected by CEQA. Both sides appealed.

The City's appeal concerns (1) whether CEQA and other applicable law allowed it to assign the authority to approve both the mitigated negative declaration and the project to the City's Historic Preservation Commission (Preservation Commission) and (2) whether the City actually delegated that authority.

Plaintiff's cross-appeal concerns whether the City and the Preservation Commission should have prepared an environmental impact report (EIR) for the project because plaintiff presented a fair argument that the two homes, or the district where they and the project were located, were "historical resources"[2] and thus part of the environment protected by CEQA.

---

[1] Public Resources Code section 21000 et seq. All further statutory references are to the Public Resources Code unless stated otherwise.

[2] The terminology appearing in this opinion is inconsistent as to whether a resource in question is "historic" or "historical" because CEQA and California Code of Regulations, title 14, section 15000 et seq. (hereinafter referred to as Guidelines) use the word "historical" while the Fresno Municipal Code uses "historic." (Compare § 21084.1 & Guidelines, § 15064.5 with Fresno Mun. Code, §§ 12-1603(o) ["Historic Resource" defined] & 12-1609.) Generally, this opinion defers to the conventions adopted by the Legislature and (1) uses historical, rather than historic, as the modifier of resource and (2) uses "an" rather than "a" when the term "historical resource" is preceded by an indefinite

2.

We conclude that CEQA allows a local lead agency, such as the City, to delegate the authority to approve a mitigated negative declaration and a project to a nonelected decisionmaking body such as the Preservation Commission. In this case, however, the Fresno Municipal Code[3] did not actually authorize the Preservation Commission to (1) complete the environmental review required by CEQA and (2) approve the mitigated negative declaration. As a result, the Preservation Commission's approval of the mitigated negative declaration did not comply with CEQA.

As to historical resources, we confirm our statutory analysis in *Valley Advocates v. City of Fresno* (2008) 160 Cal.App.4th 1039 (*Valley Advocates*) and conclude that the substantial evidence test, rather than the fair argument standard, applies to a lead agency's discretionary determination of whether a building or district is an historical resource for purposes of CEQA. Therefore, the trial court did not err when it applied the substantial evidence test to the City's determination that no historical resources were impacted by the project.

We therefore affirm the judgment.

## FACTS

*Parties*

The plaintiff in this CEQA case is an unincorporated association named "Citizens for the Restoration of L Street." Plaintiff was formed in June 2011 to protect the historic significance of a neighborhood at the upper (i.e., northwest) end of L Street in downtown Fresno.

Defendants include the City, its city council (City Council), City's development and resource management department, and the City's Preservation Commission.

---

article. (But see, Bryson, Dictionary of Troublesome Words (2d ed. 1987) pp. 13 ["a" and "an"] & 81-82 ["historic" and "historical"].)

**3** All further municipal code references are to the Fresno Municipal Code.

3.

The real parties in interest include FFDA Properties, LLC and Granville Homes (collectively, Granville), the developers of the project.  Plaintiffs also have named the Fresno Redevelopment Agency and the Housing Authorities of the City and the County of Fresno (the Housing Authority) as real parties in interest.

*Project*

Granville proposed building 14 duplex structures containing 28 two-story townhouses on 1.29 acres of land located in the 1700 block of L Street in downtown Fresno (the Project).[4]  The project site contained vacant lots and two houses.

*Properties*

One house on the project site was built in 1906 by Judge William D. Crichton and was designated a Heritage Property[5] by the Preservation Commission in 2006 (the Crichton Home).  The other house was built in 1910 and was known as the Julia Sayre Home (the Sayre Home).  The Sayre Home had no historical listing or designation.

In August 2010, the Housing Authority and Granville entered into a purchase and sale agreement and joint escrow instructions that stated the Housing Authority would sell Granville various parcels contained within the Project site, including the Crichton and Sayre homes, in exchange for Granville's payment of $525,000 plus additional amounts to reimburse certain demolition costs.  Granville's obligation to purchase was contingent

---

[4]     The project's location is the north corner of the intersection of L Street and San Joaquin Street.  The north designation of this corner is accurate because L Street runs on a northwest to southeast axis and San Joaquin Street runs northeast to southwest.

[5]     For purposes of this opinion, "Heritage Property" means a building, structure, object or site designated a Heritage Property pursuant to the procedures contained in Municipal Code section 12-1612.  The Municipal Code section 12-1603, subdivision (n) defines a "Heritage Property" as a resource that is not proposed for and is not designated as an "Historic Resource" pursuant to the Municipal Code, but is worthy of preservation because of its historical, architectural or aesthetic merit.

The "Heritage Property" category was established for resources that have historic merit, but which may have problems with integrity or which may be a contributor to a proposed historic district though they lack significance as an individual resource.

4.

upon a number of events, including (1) the issuance of demolition permits for the Crichton Home and the Sayre Home and (2) the approval of a conditional use permit for the Project.

The physical condition of the Crichton Home is addressed in many documents in the administrative record. By June 2011, the Crichton Home had been vacant for five years and was in a state of disrepair. It had lost the majority of its historic integrity because of the loss of original woodwork, enclosure of the original front porch, alteration of a character-defining bay window, installation of vinyl sash windows, replacement of the original roof,[6] and other inappropriate restoration and alteration elements. Inspections showed the interior was 90 percent gutted, the upstairs ceiling was collapsing, and the presence of fungus, dry rot, feline and human feces, lead paint and asbestos.[7]

In 2011 the Sayre Home was being used as an office for a nonprofit organization, although it was in a state of disrepair. The Sayre Home was not designated a Heritage Property because innumerable alterations led to a loss of its integrity as an historical building.

*The District*

A proposed "L" Street Historic District[8] with various boundaries has been identified in three separate survey reports prepared since the early 1980s. The first

---

**6** The new roof was added in 2007 using funds from a Community Development Block Grant. No further work appears to have been done on the house and it continued to deteriorate.

**7** These inspections were described in a May 2011 report to the Historic Preservation Commission. The report also stated that the former owner, One-By-One Leadership, requested the Crichton Home be designated a Heritage Property because it was believed that the designation would facilitate the use of the Historic Building Code, which would lower restoration costs.

**8** For purposes of this opinion, the term "Historic District" means both a "Local Historic District" and a "National Register Historic District" as those terms are defined in Municipal Code section 12-1603, subdivisions (s) and (u). "Local Historic District" means "any finite group of resources related to one another in a clearly distinguishable

survey proposed a district covering 17 blocks.  In 1994, the "*Ratkovich Plan Historic Resources Survey*"[9] proposed a district with consolidated boundaries that included both the Crichton Home and the Sayre Home as contributors, meaning they would contribute to the historical significance of a local district.  The proposal was never adopted by the City Council.

Most recently, the City's "*Upper Triangle Areas Historic Property Survey*" of 2007 included a proposed "L Street Residential Historic District" of 21 properties, eight of which had been individually designated on Fresno's local register of historical resources.  The Crichton Home was the only Heritage Property among the 21 properties. Four of the 21 properties have burned and been demolished.  Five of the structures designated on the local register as historical resources are located across from the project on the opposite side of L Street.  In ascending order by street address, the properties are referred to as the Kutner Home; the Bean Home; the Towne Apartments; the Long (Black) Home; and the Helm Home (Alamo House).

Despite the three survey reports, neither the Preservation Commission nor the City Council has taken action to designate the area an Historic District.

*Approval Process*

In January 2011, Granville submitted applications for a conditional use permit and a vesting tentative tract map for the duplex project.  In April 2011, the Housing Authority submitted applications for demolition permits for the Crichton Home and the Sayre Home.

In June 2011, a CEQA initial study and mitigated negative declaration for the Project was completed.  It concluded that the project would not result in any significant

---

way or any geographically definable area which possesses a significant concentration, linkage or continuity of sites, buildings, structures or objects united historically or aesthetically by plan or physical development."  (Mun. Code, § 12-1603, subd. (s).)

[9]     In *Valley Advocates*, *supra*, 160 Cal.App.4th at page 1057, this document was referred to as the 1994 Powell Historic Building Survey, Historic Resources Survey.

6.

environmental impacts. With respect to historical resources, the mitigated negative declaration stated that neither the Crichton Home nor the Sayre Home would qualify as historical resources under the definitions contained in section 21084.1 or Guidelines section 15064.5. As a result, the mitigated negative declaration concluded that demolition of the two homes would not cause a substantial adverse change in the significance of an historical resource.

On June 7, 2011, City filed a "NOTICE OF INTENT TO ADOPT A MITIGATED NEGATIVE DECLARATION"[10] concerning the applications for a conditional use permit and a vesting tentative tract map. The notice stated that the project would require the demolition of the two structures on the project site, identified the Crichton Home as one of the structures, and stated the Crichton Home was a Heritage Property as defined in section 12-1603 of the Municipal Code.

The notice of intent stated that any interested person could submit written comments on or before June 27, 2011, to a person and address at the City's development and resource management department. The notice also stated that the development applications and the proposed environmental finding of no significant impact "have been tentatively scheduled to be heard by the Planning Commission on July 20, 2011 at 6:00 p.m. or thereafter."

The notice of intent omitted the following information: (1) The fact that demolition *permits* were necessary; (2) The identity the department or body that would *approve* the demolition, regardless of whether that approval would include the issuance of demolition permits; (3) The fact that the Preservation Commission would have any role in reviewing the project, much less that it would consider or approve the mitigated negative declaration.

---

**10** A notice of intent is one of the notices required by CEQA during the course of an environmental review. (§ 21092, subd. (a).) The notice and the applicable procedures are described in Guidelines section 15072.

*Preservation Commission Hearing*

On June 27, 2011, the Preservation Commission held a public meeting where it considered the mitigated negative declaration and the issuance of a demolition permit for the Crichton Home. At the meeting, a staff report was presented and members of the public were allowed to present their views. The staff report again described the deteriorated condition of the Crichton Home and stated the building had been unsuccessfully offered for sale at $1 to any person or agency that could relocate the building.

By a four-to-one vote, the Preservation Commission adopted a motion to elect not to exercise its discretion under CEQA to determine that any of the buildings on the project site were historical resources. It also adopted a motion approving the mitigated negative declaration.

On June 30, 2011, City filed a "NOTICE OF DETERMINATION"[11] that contained essentially the same project description as the notice of intent that was filed on June 7, 2011. The notice of determination stated:

> "This is to advise and certify that the Historic Preservation Commission of the City of Fresno, the Lead Agency, approved a demolition permit for the above-described project on June 27, 2011 and has made the following determinations regarding this project: .…"

The determinations were that the project would not have a significant effect on the environment, a mitigated negative declaration was prepared for the project pursuant to the provisions of CEQA, and mitigation measures were made a condition of approval of the project.

---

[11] This type of CEQA notice by a local agency is addressed in section 21151, subdivision (a). (See § 21108, subd. (a) [notice by state agency].) The contents and procedures applicable to a notice involving a mitigated negative declaration are addressed in Guidelines section 15075. A properly filed and posted notice of determination starts the 30-day statute of limitations for court challenges to the agency's CEQA determination. (§ 21167, subd. (e); Guidelines, § 15075, subd. (g).)

*Plaintiff's Appeal of Preservation Commission Decision*

On August 1, 2011, plaintiff sent City Council a letter appealing the adoption of the mitigated negative declaration by the Preservation Commission on June 27, 2011, pursuant to section 21151, subdivision (c). The letter asserted, among other things, that the Preservation Commission did not appear to have authority under the Municipal Code to make CEQA determinations.

On November 3, 2011, the City Council considered the appeal. The City Council unanimously passed a motion (1) upholding the Preservation Commission's finding that the Crichton Home did not fit within the definition of an historical resource under the CEQA Guidelines; (2) electing not to exercise the City Council's discretion to determine that any of the buildings on the project site were historical resources or that the area was an Historic District and, as such, an historical resource; and (3) upholding the Preservation Commission's approval of the environmental findings and determination of the mitigated negative declaration.

On November 4, 2011, City filed another notice of determination concerning the project and mitigated negative declaration. The notice stated that the City Council had considered and "upheld" the action of the Preservation Commission on June 27, 2011.

**PROCEEDINGS**

On Monday, December 5, 2011, plaintiff filed a petition for writ of mandamus alleging that the administrative record supported a fair argument that the project may have significant impacts on historical resources, including the potential Historic District. Plaintiffs alleged that the preparation of an EIR instead of a mitigated negative declaration was required to comply with CEQA. Injunctive relief was not requested.

On Friday, December 9, 2011, City issued demolition permits in the late afternoon. By mid-afternoon on Saturday, the Crichton Home and the Sayre Home had been leveled.

9.

In February 2012, City filed a motion seeking the "dismissal" of certain paragraphs of plaintiff's petition on the grounds that the claims made or the relief requested in those paragraphs had been rendered moot by the demolition of the Crichton Home and the Sayre Home. The trial court denied the motion.

In April 2012, a 15-volume administrative record of proceedings containing 4,416 pages was certified and filed with the trial court.

On August 31, 2012, after the parties had briefed the merits of plaintiff's CEQA claims, the trial court held a hearing.

On October 11, 2012, the trial court issued a written statement of decision and judgment that ordered the issuance of a peremptory writ of mandamus. The court determined the Preservation Commission was not authorized to approve the mitigated negative declaration and the City Council's subsequent decision did not cure the CEQA defects in the proceedings before the Preservation Commission.

The trial court's writ directed the City and the City Council to set aside its decision of November 3, 2011, affirming the Preservation Commission's approval of the mitigated negative declaration and granting the application to demolish the Crichton Home and the Sayre Home. The writ directed the City Council to conduct a de novo public hearing on whether to approve the mitigated negative declaration.

On December 7, 2012, the City filed a return to the writ of mandamus stating that, following a publicly noticed hearing, the City Council had adopted a resolution approving a revised mitigated negative declaration and a resolution approving the Project. That same date, the City filed a notice of appeal from the parts of the October 11, 2012, judgment concerning City's delegation of authority to the Preservation Commission to approve the mitigated negative declaration and the demolition permits.

Three days later, plaintiff filed objections to the return, alleging that the City Council's approval failed to comply with the CEQA requirements for the publication of a

10.

notice of availability, a 20-day comment period, and notice of the location where the public could view the environmental document.

In January 2013, plaintiff filed a cross-appeal to challenge the trial court's decision not to require the preparation of an EIR because the two homes, or the district, were historical resources, and thus part of the environment protected by CEQA.

## DISCUSSION

I.  STANDARD OF REVIEW

Appellate review in this CEQA proceeding is governed by the abuse of discretion standard set forth in section 21168.5.  Consequently, our "inquiry shall extend only to whether there was a prejudicial abuse of discretion.  Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence."  (§ 21168.5.)

Under this abuse of discretion standard, we independently review claims that a public agency committed legal error (i.e., did not proceed in the manner required by law) in conducting the environmental review required by CEQA.  (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426-427.)  By comparison, we review claims that an agency committed factual errors under the substantial evidence standard.  (*Id*. at p. 426.)

This appeal concerns (1) the delegation of a lead agency's authority and (2) the proper analysis of resources that may have historic significance.  Both of these issues present questions of law.  Therefore, we will conduct an independent review when deciding whether City committed prejudicial error while performing its environmental review.

II.  DELEGATION OF A LEAD AGENCY'S AUTHORITY

A.  Background Legal Principles

In CEQA cases involving a mitigated negative declaration, the *decisionmaking body* of the *lead agency* must consider and adopt the mitigated negative declaration prior

to *approving* the *project*. (Guidelines, § 15074, subd. (b).) The italicized words are CEQA terms of art that provide the foundation for our analysis of the issue presented by City's appeal.

First, the "project" includes both demolishing the Crichton and Sayre Homes and building the townhouses.

Second, under Guidelines section 15352, subdivision (b), the "approval" of the project "occurs upon the earliest commitment to issue of the issuance by the public agency of a discretionary … permit …." Here, the demolition permit is the first of the discretionary permits required for completion of the project and, therefore, the Preservation Commission's approval of the demolition permit marks the "approval" of the project for purposes of CEQA, even though subsequent authorizations were needed before the construction phase could begin.

Third, the "lead agency" is the City. (§ 21067.)

Fourth, the City contends the Preservation Commission was its "[d]ecision-making body" in this case—that is, the "group of people within a public agency permitted by law to approve or disapprove the project at issue." (Guidelines, § 15356.) The Preservation Commission's authority to approve demolition permits for a Heritage Property is set forth in Municipal Code section 12-1619—this aspect of the Preservation Commission's authority is not disputed in this appeal.

A decisionmaking body's responsibilities include more than just approving the project. It also must consider and adopt the environmental review document—in this case, the mitigated negative declaration. (*POET, LLC v. State Air Resources Bd.* (2013) 218 Cal.App.4th 681, 731 ["CEQA is violated when the authority to approve or disapprove the project is separated from the responsibility to complete the environmental review"]; see Guidelines, § 15022, subd. (a)(9).) The decisionmaking body obtains the authority to adopt a mitigated negative declaration and approve a project as a result of an assignment or delegation of that authority by the lead agency. Lead agencies such as the

City may delegate both types of authority to a nonelected, subordinate body, provided that they also provide for an appeal to the lead agency's elected decisionmaking body, if any. (§ 21151, subd. (c).)

B.     Issue Presented

Stated in broad terms, the issue presented by City's appeal is whether the Preservation Commission had the authority to act as the lead agency's decisionmaking body.

The trial court determined that the City had "not proceeded in the manner required by law", as that phrase is used in section 21168.5, because the Preservation Commission did not have the authority to review and approve both the mitigated negative declaration and the project.

Because the Preservation Commission had the authority to approve the demolition permit, it had the authority to "approve" the "project" for purposes of CEQA. Thus, the primary issue presented by City's appeal is whether the Preservation Commission *also* had the authority to approve the relevant CEQA document. Because the Preservation Commission's powers are defined by the Municipal Code,[12] the specific question presented is whether the Municipal Code granted the Preservation Commission the authority to approve or disapprove the mitigated negative declaration?

C.     Textual Analysis of Municipal Code

The City concedes that the Municipal Code does not explicitly authorize the Preservation Commission to approve environmental review documents required by CEQA or, more specifically, negative declarations or mitigated negative declarations. Also, the Municipal Code does not designate the Preservation Commission as the "decisionmaking body" for projects that involve the demolition of a building designated as a Heritage Property. Consequently, the City argues that the grant of authority over the

---

[12]     CEQA implementing procedures may be adopted "by ordinance." (§ 21082.)

13.

CEQA documents is implied by the provisions in Municipal Code sections 12-1606 and 12-1619. Like the trial court, we disagree.

### 1. Provisions of the Municipal Code

Municipal Code section 12-1606 sets forth the duties and powers of the Preservation Commission. Subdivision (b) enumerates 25 "additional duties," including the two relied upon by City:

> "(5) Participate in environmental review procedures called for under this article or under [CEQA] or under the National Environmental Protection Act (NEPA) by providing review and comments on permit actions affecting designated Historic Resources, Historic Districts and Heritage Properties as the Commission deems appropriate.

> "(6) Review and comment upon the conduct of land use, housing, redevelopment, municipal improvement and other types of planning and programs undertaken by any agency or department of the city, county or state as they relate to designated Historic Resources, Historic Districts and Heritage Properties as the Commission deems appropriate."

Municipal Code section 12-1619 describes the review process for permits involving "Heritage Property."[13] Subdivision (a) states that it shall be unlawful for any person to alter or demolish a "Heritage Property without first obtaining a city permit and the written approval of the Historic Preservation Commission." Subdivision (b) provides that, upon receipt of an application for a demolition permit for a Heritage Property, "the city department or agency receiving same shall, within five (5) calendar days, notify the Secretary and forward said permit application or proposal and accompanying documentation to the Specialist and shall not process the permit or proposal without the authorization of the Specialist."[14] Municipal Code section 12-1619 does not mention *environmental* review.

---

**13** The Municipal Code states that the designation of a building as a Heritage Property, in and of itself, does not create any presumption that the building qualifies as an historical resource pursuant to CEQA. (Mun. Code, § 12-1612, subd. (e).)

**14** The term "Secretary" means the Director of Housing and Neighborhood Revitalization or his or her designee. (Mun. Code, § 12-1603, subd. (cc).) The term

14.

In contrast, the Municipal Code explicitly addresses some types of environmental review. Any application for a permit that proposes the substantial alteration of an historical resource or objects within an historic district must be "referred to the Director of the Development Department for environmental review." (Mun. Code, §§ 12-1617, subd. (c) & 12-1618, subd. (c).)[15] There is no parallel review provision for Heritage Properties.

### 2. Implied Authority

The City argues that the Preservation Commission's authority to conduct an environmental review and approve a negative declaration is *implied* by the provision that states the Preservation Commission has the power to "[p]articipate in environmental review procedures called for … under [CEQA] by providing review and comments on permit actions affecting designated Historic Resources, Historic Districts and Heritage Properties as the Commission deems appropriate." (Mun. Code, § 12-1606, subd. (b)(5).) We disagree with City's interpretation.

First, the phrase "participate in environmental review procedures" does not imply that the Preservation Commission is the body with the primary responsibility to complete the environmental review and decide whether a negative declaration or EIR is needed. The term "participate in" the environmental review suggests a secondary role, rather than primary responsibility for performing or conducting that review. Indeed, with respect to

---

"Specialist" means the "Historic Preservation Specialist serving as staff to the Historic Preservation Commission." (Mun. Code, § 12-1603, subd. (ff).)

**15** We note, but do not decide, the question whether the referral of the environmental review to the director and the requirement for a written approval from the Historic Preservation Commission creates a split in responsibility that violates CEQA. (See *POET, LLC v. State Air Resources Bd.*, *supra*, 218 Cal.App.4th at p. 731 [CEQA by board's approval of project and delegation of the responsibility to complete the environmental review to its executive officer]; *El Morro Community Assn. v. California Dept. of Parks & Recreation* (2004) 122 Cal.App.4th 1341, 1349-1350 [CEQA requirements met where deputy director held the authority to both certify the EIR and approve the project].)

15.

two of the three subjects covered by Municipal Code section 12-1606, subdivision (b)(5)—namely, designated historical resources and historic districts—the role of the Preservation Commission is clearly secondary and the primary responsibility for conducting the environmental review is assigned to the Director of the Development Department. (See Mun. Code, §§ 12-1617, subd. (c) & 12-1618, subd. (c).) Thus, City's position regarding the interpretation of Municipal Code section 12-1606, subdivision (b)(5) requires the language to be read one way for permit applications involving designated historical resources and historic districts and a different way for permit applications involving Heritage Property. The City's appellate briefing has not presented authority that would justify multiple interpretations of a particular phrase. Therefore, we conclude that the phrase "participate in environmental review procedures" means the same thing when it concerns a Heritage Property as it does when it concerns a designated historical resource or historic district. Thus, "participate in" does not mean "take responsibility for completing" the environmental review.

Second, the phrase "providing review and comments on permit actions" does not imply that the Preservation Commission was granted the authority to conduct the environmental review and approve the final CEQA document. The City argues that "review" should be interpreted as inclusive of the concluding or approval steps in the review process. The argument is unconvincing.

First, as with the interpretation of "participate in," this interpretation of "review" is nonsensical when the permit application involves a designated historical resource or historic district because, in those situations, the environmental review is the responsibility of the Director of the Development Department. (See Mun. Code, §§ 12-1617, subd. (c) & 12-1618, subd. (c).)

Second, the City's argument ignores the context in which the term "review" is used; it is part of the phrase "providing review and comments." The word "providing" means supplying or furnishing, which makes in an unlikely choice for expressing an

intent to authorize the Preservation Commission to complete the environmental review process and approve or disapprove the negative declaration. (See Webster's 3d New Internat. Dict. (1993) p. 1827, col. 1 [synonyms of provide are supply and furnish].) Specifically, it is awkward to say that a decisionmaker will furnish or supply *itself* with review and comments. Furthermore, the phrase "review and comment" is used many times in CEQA and the Guidelines and it usually refers to persons or entities supplying or presenting comments to the lead agency, not action taken by a lead agency or its decisionmaking body. For example, the topic of adequate time for review and comment is addressed in Guidelines section 15203, which states that the "lead Agency shall provide adequate time for other public agencies and members of the public to *review and comment* on a draft EIR or Negative Declaration that it has prepared." (Italics added.) (See §§ 21080.5, subds. (d)(2)(F), (d)(3)(B) & (f), 21083, subd. (d), 21091, subds. (a), (b) & (c)(1), 21178, subd. (c).) Similarly, a responsible agency "should review and comment on … negative declarations for projects which the responsible agency would later be asked to approve." (Guidelines, § 15096, subd. (d).) Thus, the phrase "providing review and comments" indicates that the Historic Preservation Commission's responsibility is like that of an entity that supplies comments to the lead agency's decisionmaking body, rather than an entity that decides whether to approve or disapprove a negative declaration.

Third, the last phrase in Municipal Code section 12-1606, subdivision (b)(5) is "as the Commission deems appropriate." This phrase appears to commit the matters previously referred to in the sentence to the discretion of the Preservation Commission. In short, the grant of authority to participate in environmental review by supplying review and comments as the Preservation Commission deems appropriate is much different from language that requires the Preservation Commission take responsibility for deciding whether to approve or disapprove a negative declaration.

Finally, besides its textual analysis, the City contends policy grounds support its interpretation of the Municipal Code. The City asserts that the broader effects of the trial

17.

court's ruling wreak potential havoc on the well-established process by which the City considers development proposals and related environmental documents. This argument regarding administrative convenience does not convince us to rely on unreasonable inferences and extrapolations when interpreting the Municipal Code sections that concern Heritage Properties. If the City wishes to grant the Preservation Commission the authority to approve such a project, along with the concurrent authority to approve or disapprove negative declarations concerning such projects, then it should adopt an ordinance that expressly grants such authority and otherwise complies with the requirements for implementing procedures. (See § 21082; Guidelines, § 15022 [contents of clear and orderly implementing procedures]; 1 Kostka & Zischke, Practice under the Cal. Environmental Quality Act (Cont.Ed.Bar 2d ed. 2014) § 3.44, pp. 3-39 to 3-40 (rev. 3/14) [adoption of implementing procedures is mandatory].)

### D. City Council's Subsequent Approval

#### 1. Contentions of the Parties

The City contends that, even if the Preservation Commission lacked the authority to approve the mitigated negative declaration, the City Council conducted a de novo review of the mitigated negative declaration and subsequent project approval and that de novo review cured any defect in the proceedings before the Preservation Commission.

Plaintiff responds by arguing that the City Council's denial of its appeal is not the equivalent of the City Council conducting an independent examination, because the procedures followed by the City Council did not comply with all of CEQA's procedural requirements for the adoption of a negative declaration. Specifically, plaintiff contends that the City Council did not provide the required notice or make the requisite findings.

#### 2. Administrative Appeal as an Independent Decision

We accept the fundamental premise of the parties' argument that the CEQA defects in the earlier proceedings would have been rendered irrelevant and nonprejudicial if the appeal to the City Council resulted in a decision that was CEQA-compliant in its

18.

own right. Therefore, we conclude that CEQA compliance would have been achieved if (1) the City Council acted as the final, independent decisionmaking body for both the project and the environmental review documents and (2) the procedures used by the City Council complied with the various requirements of CEQA. As discussed below, neither condition was satisfied in this case.

### 3. Splitting Responsibility for Decisions

As to the first condition, the City Council did not act as the lead agency's independent decisionmaking body for *both* the adoption of the mitigated negative declaration and the approval of the project. A decision on both matters must be made by the same decisionmaking body because "CEQA is violated when the authority to approve or disapprove the project is separated from the responsibility to complete the environmental review." (*POET, LLC v. State Air Resources Bd.*, *supra*, 218 Cal.App.4th at p. 731.) Here, the record shows that the City Council did not make both decisions. Rather, it considered only the mitigated negative declaration.

During the November 3, 2011, meeting of the City Council, Will Tackett of the Development and Resource Management Department addressed the City Council about plaintiff's appeal. Tackett stated:

> "We would like to remind the Council that you are not reviewing the action of the Preservation Commission to approve the demolition permit for the Crichton [Home], nor are you considering the approval of any other entitlements related to the project. Specifically, the CUP or tentative map. The only matter that you are considering is the [Preservation] Commission's action related to the mitigated negative declaration prepared."

This quote demonstrates that the City Council was acting as an appellate body addressing limited issues and was not acting as the final, independent decisionmaking body for both the project and the related environmental review documents.

Despite the City's failure to satisfy the first condition, we will examine whether the administrative appeal satisfied CEQA's procedural requirements because (1) that

19.

issue could provide an alternate ground for concluding that the earlier CEQA defects were not cured by the administrative appeal and (2) there is a possibility that issues about these procedures will arise again on remand.

### 4. *Notice Requirements*

Before a lead agency adopts a negative declaration, it must provide notice to the public and other agencies of its intention. Guidelines section 15072, subdivision (a) provides:

> "A lead agency shall provide a notice of intent to adopt a negative declaration or mitigated negative declaration to the public, responsible agencies, trustee agencies, and the county clerk of each county within which the proposed project is located, sufficiently prior to adoption by the lead agency of the negative declaration or mitigated negative declaration to allow the public and agencies the review period provided under Section 15105."

Guidelines section 15105, subdivision (b) states that the public review period for a proposed negative declaration or mitigated negative declaration shall not be less than 20 days. Similarly, Guidelines section 15073, subdivision (a) provides that the lead agency "shall provide a public review period pursuant to Section 15105 of not less than 20 days."

City argues it provided adequate notice when it posted the agenda for the November 3, 2011, meeting of the City Council online and at locations in the Fresno City Hall and the Fresno Public Library on or before 5:00 p.m. on Friday, October 28, 2011. The City asserts that this notice was well in advance of the 72 hours' notice required by California's open-meetings law, the Ralph M. Brown Act. (Gov. Code, § 54950 et seq.; see Gov. Code, § 54954.2, subd. (a)(1) [agenda shall be posted 72 hours before regular meeting].) City's appellate briefing makes no attempt to show that the notice given of the City Council's consideration of the project created a public review period of at least 20 days.

We conclude that the procedures used by the City Council in handling the appeal did not comply with the notice requirements that CEQA imposes upon an independent

20.

approval of a negative declaration. Before its November 3, 2011, decision, the City Council did not provide notice of *its* intent to adopt a mitigated negative declaration along with a 20-day public review period as required by Guidelines sections 15073, subdivision (a) and 15105, subdivision (b). Therefore, CEQA's notice requirements were not satisfied.

### 5. *Findings*

If the City Council had been acting as an independent decisionmaking body when it dealt with plaintiff's appeal of the Preservation Commission's decision, the City Council would have made the findings listed in Guidelines section 15074, subdivision (b). That provision states the decisionmaking body shall adopt a proposed mitigated negative declaration "only if it finds … that there is no substantial evidence that the project will have a significant effect on the environment and that the … mitigated negative declaration reflects the lead agency's independent judgment and analysis." (*Ibid.*) The requirement for a finding about the lead agency's independent judgment is derived from section 21082.1, subdivision (c)(3), which provides that a lead agency, as part of adopting a mitigated negative declaration, shall find that the declaration reflects the independent judgment of the lead agency.

City addresses the absence of any findings in the minutes and the transcript of the City Council meeting by arguing that the findings exist in a staff report. That report does not convince us that the members of the City Council considered and determined, *based on their own independent judgment and analysis*, that the evidence showed the project would not have a significant effect on the environment. We have not located, and counsel has not cited, a specific provision in the report that demonstrates the adoption of the mitigated negative declaration reflected the City Council's independent judgment. Instead of exercising its own judgment about the evidence, the City Council simply might have been deciding that the record was sufficient to support the Preservation Commission's decision.

21.

Therefore, we conclude that the administrative appeal, standing as a separate and independent procedure, did not comply with the CEQA requirement for findings by the decisionmaking body. (See Guidelines, § 15074, subd. (b).) As a result, the trial court's decision to issue a writ of mandate will be upheld.

III. DISCRETIONARY HISTORICAL RESOURCES

A. Contentions of the Parties

Plaintiff's cross-appeal, in effect, asks this court to reject the statutory interpretation we adopted in 2008 in *Valley Advocates*, *supra*, 160 Cal.App.4th at pages 1069 through 1072 and conclude that the fair argument standard applies to the threshold question of whether a threatened building or site is an "historical resource" for purposes of CEQA. Plaintiff contends that *Valley Advocates* is contrary to all negative declaration precedent—precedent that applies the well-defined fair argument standard of review to negative declarations on an across-the-board basis. In plaintiff's view, whether a project site contains a building that is an historical resource should be reviewed under the same standard applied to whether a project site contains habitat of an endangered plant or animal.

The City challenges plaintiff's position on two grounds. First, it contends plaintiff's cross-appeal is moot because the November 3, 2011, determination challenged in the petition for writ of mandamus has been rescinded and replaced by the approvals contained in the City Council's December 2012 resolutions, which were adopted to comply with the writ issued by the trial court.

Second, the City argues that *Valley Advocates* clearly established that the fair argument standard does not apply an agency's discretionary determination regarding whether the "resource" at issue is historic for purposes of CEQA.

B. The Cross-Appeal is Not Moot

The City's mootness argument merits little discussion. An appeal is moot if the appellate court cannot grant practical, effective relief. (*Woodward Park Homeowners*

22.

*Assn. v. Garreks*, *Inc.* (2000) 77 Cal.App.4th 880, 888 (*Garreks*).)[16]  Effective relief is possible in the present appeal because, if plaintiff's argument is accepted, we would direct the trial court to vacate its earlier writ and issue a new writ requiring City to prepare and certify an EIR before approving the project.  The preparation of an EIR constitutes effective relief for purposes of California's mootness doctrine because it might lead to changes in the project, the adoption of further mitigation measures, or possibly the removal of the project.  (*Ibid*.; see *Golden Gate Land Holdings LLC v. East Bay Regional Park Dist.* (2013) 215 Cal.App.4th 353, 367 [compliance with the remedy ordered in the writ does not moot an appeal that challenges the legality of that remedy].)

      C.      <u>Background on CEQA Review and the Fair Argument Standard</u>

When a public agency considers approving or undertaking an activity, it must conduct a CEQA review, which might include three stages of review.  The first stage is a preliminary review.  (Guidelines, §§ 15060-15061.)  During the preliminary review, the agency determines (1) whether the subject matter of the proposed action constitutes a discretionary project for purposes of CEQA and (2) if so, whether the project is exempt from CEQA.  (*Association for a Cleaner Environment v. Yosemite Community College Dist.* (2004) 116 Cal.App.4th 629, 636-640; see *Tuolumne Jobs & Small Business Alliance v. Superior Court* (Aug. 7, 2014, S207173) ___ Cal.4th ___, ___ [2014 Cal. LEXIS 5464] [CEQA review process starts with a preliminary review to determine if the proposed activity is a project and is not exempt from CEQA] (*Tuolumne Jobs*).)

---

**16**    In *Garreks*, another CEQA case involving the City, this court held that the appeal was not moot even though construction of the car wash project had been completed and the car wash opened for business.  (*Garreks*, *supra*, 77 Cal.App.4th at pp. 888-889.) Effective relief remained a possibility because an "order directing the preparation of an EIR could result in modification of the project to mitigate adverse impacts or even removal of the project altogether."  (*Id*. at p. 888.)

The definition of "project" includes "an activity which may cause a direct physical change in the environment … and which [¶] … [¶] … involves the issuance to a person of a … permit … by one of more public agencies." (§ 21065, subd. (c).)

If the second stage is reached, the lead agency must conduct an initial study. (*Tuolumne Jobs*, *supra*, ___ Cal.4th ___ [pp. *10-*11].) From a procedural perspective, the purpose of the initial study is to inform the lead agency whether the environmental review of a proposed project can be concluded with the adoption of a negative declaration or, alternatively, must proceed to the third stage and preparation of an EIR. (See Guidelines, § 15063, subd. (c) [purposes of initial study].) Generally, the lead agency employs the fair argument standard when conducting an initial study and determining the need for an EIR.

The fair argument standard is met if the agency's initial study of the project produces *substantial evidence supporting a fair argument that the proposed project may have a significant adverse effect on the environment*. (*Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 171; see Guidelines, § 15064, subd. (f)(1).) When the fair argument standard is met, the lead agency must prepare an EIR analyzing the project's potential impacts on the environment before approving the project. (*County Sanitation Dist. No. 2 v. County of Kern* (2005) 127 Cal.App.4th 1544, 1580 (*County Sanitation*).) The fair argument standard is a low threshold. (*Id*. at p. 1579.)

This court observed in *County Sanitation*, *supra*, 127 Cal.App.4th 1544, that the fair argument test contains a number of terms or concepts that are defined further by CEQA, the Guidelines, or case law. (*Id*. at pp. 1580-1581.) Many of those concepts play a role in how a lead agency predicts (i.e., forecasts or estimates) whether the project *might* cause physical changes that are significant and adverse to the environment. (*Id*. at p. 1586, fn. 43.) The aspect of the fair argument standard that involves looking into the future and predicting impacts plays a small role in this appeal because it is beyond

24.

dispute that the demolition of a building is a physical change that will cause (not just might cause) a significant and adverse impact to that building. Consequently, for purposes of this appeal, the most important component of the fair argument test is the term "environment" and whether the buildings and district in question qualify as part of the "environment" protected by CEQA.

The term "environment" is defined by section 21060.5 as "the physical conditions which exist within the area which will be affected by the proposed project, including land, air, water, minerals, flora, fauna, noise, *objects of historic or aesthetic significance*." (Italics added.) Guidelines section 15360 augments this definition by explaining that the "environment" includes both natural and man-made conditions. Thus, a man-made building would qualify as part of the environment if it is an object of historic significance.

The foregoing discussion of the stages of CEQA review, the fair argument standard and CEQA's definition of the term "environment" leads to the following point. The question whether a building is an "historical resource" for purposes of CEQA and thus part of the "environment" can be conceptualized as a threshold question that must be resolved by the lead agency in order to complete its preliminary review.[17] Under this

---

[17]  We recognize that, in certain situations, a lead agency might be able to proceed to the second stage of CEQA review (i.e., the initial study) without deciding the question of historicity. For instance, some proposed activities will involve discretionary approvals for activity that would have environmental impacts other than the impacts to the potential historical resource. Those other impacts could cause the lead agency to decide an initial study was necessary regardless of how the historicity question was resolved. Consequently, the lead agency could postpone deciding the historicity question until the initial study stage of review.

For purposes of this opinion, we will assume the lead agency is required to decide historicity to complete its preliminary review. This assumption does not affect the legal conclusions reached in this opinion because the fact an agency might postpone deciding a particular question until the initial study stage does not affect the standard of review the agency applies. If it did, agencies could manipulate the applicable standard of review by deciding when the question of historicity would be addressed.

view, (1) the determination of historicity would be a foundation for the agency's determining whether the proposed activity was a project and, if so, whether the project was exempt from CEQA and (2) the fair argument standard would be applied by the lead agency after it knew whether the building was an historical resource and thus part of the "environment" protected by CEQA. Alternatively, one could adopt plaintiff's conceptualization and view the question of whether a building is an "historical resource" as one of the many issues that are addressed pre-EIR by applying the fair argument standard.

D.     Analysis

1.     *Question of Statutory Interpretation*

Ultimately, the question of how to approach "historical resources" presents this court with a question of statutory interpretation. CEQA is a broad statutory scheme and questions about its scope and requirements necessarily involve this court in statutory interpretation.[18]

2.     *Text of CEQA*

A court's inquiry into the meaning of a statute seeks to determine the intent of the lawmakers so as to effectuate the purpose of the statute. (*POET, LLC v. State Air Resources Bd.*, *supra*, 218 Cal.App.4th at p. 749) This inquiry begins with the actual words enacted by the Legislature. (*Ibid*.) Accordingly, we set forth the text of section 21084.1, the provision in CEQA that addresses historical resources, in full:

---

[18]     Neither *Architectural Heritage Assn v. County of Monterey* (2004) 122 Cal.App.4th 1095 (*County of Monterey*) nor *League for Protection of Oakland's etc. Historic Resources v. City of Oakland* (1997) 52 Cal.App.4th 896 (*League of Protection*) explicitly consider questions concerning the textual ambiguity of section 21084.1, the proper approach to resolving that ambiguity, and the intent demonstrated in that section's legislative history. As a result, those decisions are not precedent for how those issues should be resolved. (See *Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [opinions must be understood in light of the facts and issues before the appellate court; they are not authority for a proposition not considered or analyzed by the court]; see 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 509, p. 572 [what constitutes a rule of decision].)

"A project that may cause a substantial adverse change in the significance of an historical resource is a project that may have a significant effect on the environment.  For purposes of this section, an historical resource is a resource listed in, or determined to be eligible for listing in, the California Register of Historical Resources.  Historical resources included in a local register of historical resources, as defined in subdivision (k) of Section 5020.1, or deemed significant pursuant to criteria set forth in subdivision (g) of Section 5024.1, are presumed to be historically or culturally significant for purposes of this section, unless the preponderance of the evidence demonstrates that the resource is not historically or culturally significant.  The fact that a resource is not listed in, or determined to be eligible for listing in, the California Register of Historical Resources, not included in a local register of historical resources, or not deemed significant pursuant to criteria set forth in subdivision (g) of Section 5024.1 shall not preclude a lead agency from determining whether the resource may be an historical resource for purposes of this section."[19]

Other provisions in CEQA address historical resources, including subdivision (e) of section 21084, which states:  "A project that may cause a substantial adverse change in the significance of a historical resource, as specified in Section 21084.1, shall not be exempted from [CEQA]."[20]

In addition, section 21001, subdivision (b) sets forth the Legislature's declaration that it is the policy of California to take "all action necessary to provide the people of this state with … enjoyment of aesthetic, natural, scenic, and historical environmental qualities …."

None of the statutory provisions mentioning historical resources explicitly state, one way or the other, whether the fair argument standard applies during the initial study

---

[19]    This statutory text creates three routes by which an object may come to be regarded as an historical resource for purposes of CEQA.  We have labeled these routes as "(1) mandatory historical resources, (2) presumptive historical resources and (3) discretionary historical resources."  (*Valley Advocates*, *supra*, 160 Cal.App.4th at p. 1051.)  In *Valley Advocates*, we discussed these three routes at length.  (See *Id*. at pp. 1051-1064 [parts II through IV].)  A repetition of that discussion is not necessary here.

[20]    This provision acts as a limitation on the authority that section 21084 gives to the secretary of the Natural Resources Agency to adopt regulations that list classes of projects that are exempt from CEQA.

stage to the question whether a building or other object is an historical resource for purposes of CEQA. Similarly, Guidelines section 15064.5, the regulation that addresses historical resources, does not provide an explicit answer. The absence of explicit statutory or regulatory language leads us to conclude that CEQA and the Guidelines are ambiguous concerning whether the fair argument standard is used to decide whether a building or other object is an historical resource for purposes of CEQA.

### 3. Legislative History and Statutory Context

When statutes are ambiguous, courts may consider extrinsic aids, such as legislative history. (*Committee for Green Foothills v. Santa Clara County Bd. of Supervisors* (2010) 48 Cal.4th 32, 45 [interpretation of CEQA provision].) In this appeal, the parties did not include any legislative history in the appellate record. However, during oral argument counsel for plaintiff argued that the part of the legislative history quoted in *Valley Advocates* concerned categorical exemptions, not the appropriate standard of review. This argument was not raised in the parties' brief. Nevertheless, because the issue concerning the appropriate standard for determining historicity is an issue of statewide concern, we sent counsel a copy of the legislative history for Assembly Bill No. 2881 (Reg. Sess. 1991-1992)[21] and requested supplemental briefing on the inferences that might be drawn from it. In particular, we asked about inferences regarding the use of the fair argument standard to determine historicity during the preliminary review and initial study stages of the CEQA review process.

Plaintiff's supplemental brief argues that the legislative history did not mention the terms "fair argument" or "standard of review" and, therefore, this court should not rely on an inference drawn from an incidental statement in the legislative history to determine the fair argument standard does not apply to questions of historicity.

---

[21] This legislation enacted section 21084.1 and added subdivision (e) to section 21084. (Stats. 1992, ch. 1075, §§ 7, 8, pp. 5001-5004.) We took judicial notice of its legislative history in *Valley Advocates*, *supra*, 160 Cal.App.4th at page 1071, footnote 20.

In response, City argues that the inference drawn from the legislative history in *Valley Advocates* was correct and the fair arguments standard is not consistent with the discretionary authority given the lead agency to determine whether an object is an historical resource.

The legislative history for Assembly Bill No. 2881 provided:

"1. Only historical resources either included in or determined eligible for inclusion on the California Register of Historical Resources are statutorily significant for CEQA purposes. This means that either an EIR or mitigated negative declaration would probably be required for any project that would substantially harm such resources. A lead agency would have no discretion to consider such resources as anything but significant.

"2. Resources on a local register of historical resources or included in the State Inventory of Historic Resources with a ranking of 5 or higher would NOT be statutorily significant for CEQA purposes but would be PRESUMED to be significant unless the weight of evidence demonstrated they were not. A lead agency would almost certainly have to consider such resources significant for CEQA purposes. However, the door would be left open for someone to argue against significance and if convinced by such argument, a lead agency would have the discretion to consider the resource not to be significant. *If this occurred, neiither [sic] an EIR nor a mitigated negative declaration would be required.*

"In effect, this means that for CEQA purposes, local properties or those in the State Inventory are not considered quite as important as properties included in or eligible for inclusion in the California Register.

"3. Resources which have not been considered for the California Register, for a local register or for the State Historic Resources Inventory may, at the discretion of a lead agency, be evaluated to determine if they are significant for purposes of CEQA." (Sen. Com. on Natural Resources and Wildlife, Analysis of Amends. to Assem. Bill No. 2881 (1991–1992 Reg. Sess.) Aug. 8, 1992, p. 1, italics added.)

This excerpt from the legislative history demonstrates a legislative intent to allow a lead agency to make a *discretionary* decision about the historic significance of certain resources—a decision that would preclude the need for an EIR or a mitigated negative declaration. Such a decision would need to be made during the first stage of the CEQA review so that the lead agency could determine (1) whether the proposed activity was a

29.

project that might cause a direct physical change in the environment and (2) whether the project, if any, was exempt from CEQA. Making a discretionary determination during the preliminary review is antithetical to plaintiff's position that only a fair argument that an object is an historical resource is needed to require the lead agency to prepare an EIR before approving the demolition of that object. For instance, the legislative history refers to a resource that is *presumed* to have historic significance and notes an EIR or mitigated negative declaration would not be required if the lead agency is convinced the resource has no historic significance. Obviously, the facts that create the presumption (such as inclusion on a local register) would establish a fair argument that the resource is an historical resource for purposes of CEQA. Therefore, if the lead agency is allowed to be convinced that the presumption is overcome, it logically follows that the lead agency is not applying the fair argument standard at that point in its evaluation.

Furthermore, we are not convinced by plaintiff's argument that the statements in the legislative history were meant to refer only to categorical exemptions and provide no insight into the appropriate standard of review. If plaintiff's position were accepted, the lead agency would make a discretionary determination to complete the preliminary review. If the lead agency decided an initial study was necessary, plaintiff's position would require the agency to ignore the decision about historicity it made during the preliminary review and apply the fair argument standard to that question when completing its initial study. Flip-flopping standards between the first and second stages of CEQA review makes little sense. It would mean agencies exercise their discretion during the first stage, but not the second because applying the fair argument standard is a question of law that is not discretionary. We have located nothing in the legislative history indicating the Legislature intended such a result. Instead, the legislative history shows the Legislature intended the question of historic significance to be resolved early in the environmental review process, an approach that would avoid the delays and

30.

expense of an EIR in cases where the lead agency exercises its discretion by concluding the building or other object in question is not an historical resource.

In summary, we conclude that, during the preliminary review stage of a CEQA review, the fair argument standard does not apply to the question of whether a building or other object qualifies as an historical resource for purposes of CEQA. (*Valley Advocates*, *supra*, 160 Cal.App.4th at p. 1072.) Rather, the question whether an object is an historical resource and thus part of the environment protected by CEQA must be resolved by the lead agency, under the three analytical categories established by section 21084.1 and Guidelines section 15064.5, subdivision (a),[22] before it applies the fair argument standard to determine whether the project may have a significant adverse impact on the environment.

### 4. *Plaintiff's Other Arguments*

The foregoing statement of our rationale for concluding that the fair argument standard does not apply satisfies the constitutional mandate for an opinion that states the reasons for the disposition. (Cal Const., art. VI, § 14 [appellate decisions "that determine causes shall be writing with reasons stated"].) Nevertheless, we will provide a further explanation of our decision by addressing specific points raised by plaintiff.

First, plaintiff contends that our rejection of the fair argument standard is contrary to the Supreme Court's directive in *Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal.3d 247 that CEQA must be interpreted "to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." (*Id*. at p. 259; Guidelines, § 15003, subd. (f).) This argument is unconvincing because it begs the question whether the purported historical resource is part of the protected "environment" for purposes of CEQA. The Supreme Court's policy statement cannot be read to mean

---

**22**    In *Valley Advocates*, *supra*, 160 Cal.App.4th at page 1051, we labeled the three categories as (1) mandatory historical resources, (2) presumptive historical resources and (3) discretionary historical resources.

31.

that CEQA must be interpreted to afford the fullest possible protection to objects that *might* have historic significance. Such a reading is not "within the reasonable scope of the statutory language" when that language is interpreted to effectuate the apparent intent of the lawmakers. In contrast, our interpretation of section 21084.1 and its legislative history complies with the limitation stated by the Supreme Court.

Second, plaintiff contends that *Valley Advocates* is contrary to all negative declaration precedent, which applies the well-defined fair argument standard of review to negative declarations on an across-the-board basis. Plaintiff equates the question whether a project site contains a building that is an historical resource with the question whether a project site contains habitat of an endangered plant or animal and contends that the same standard should be applied to both questions. The flaw in this argument is that the questions are not equivalents. Whether a project site contains habitat of an endangered plant or animal is subject to CEQA's general provisions. In contrast, the Legislature enacted a specific section of CEQA to address historical resources. (§ 21084.1.) In short, different standards apply because the two questions are governed by different statutes.

Third, plaintiff contends that when experts dispute how to apply the definition of "historical resources," the application of the fair argument standard is essential. Plaintiff supports this argument by stating: "This is why CEQA Guideline section 15064.5 provides that a resource '*shall be considered by the lead agency to be historically significant*' if it meets the criteria for listing in the California Register—based on fact-based expert evidence."

We acknowledge that this regulatory language uses the mandatory term "shall." (See Guidelines, § 15005, subd. (a) ["shall" and "must" are mandatory].) However, the language quoted and italicized by plaintiff must be considered in context. The sentence in which the quoted language appears addresses the discretionary category of historical resources and begins: "Generally, a resource shall be considered by the lead agency to be

'historically significant' if the resource meets the criteria for listing on the California Register of Historical Resources ….'" (Guidelines, § 15064.5, subd. (a)(3).) The use of the word "generally" means the regulation sets forth a general rule that is subject to exceptions. As a result, the use of the word "shall" does not deprive a lead agency of the discretionary authority to decide that a potential historical resource that meets the criteria for listing should not be treated as such for purposes of CEQA based on other considerations. In short, the text in Guidelines section 15064.5 quoted by plaintiff does not necessarily deprive the lead agency of its discretion during the initial study stage and, furthermore, does not overcome the implications regarding legislative intent produced by the legislative history for section 21084.1.

Finally, plaintiff's position suggests that an initial study and mitigated negative declaration provides short shrift to the question of an object's historic significance and that question deserves the more rigorous scrutiny associated with the preparation and certification of an EIR. We disagree with this suggestion. The administrative record prepared in this case (which contains over 4,000 pages) demonstrates that the question whether the Crichton Home and the Sayre Home should be treated as "historical resources" for purposes of CEQA received extensive consideration during the first two stages of environmental review. The environmental review actually conducted produced the information necessary for the lead agency to make an informed decision and for the public to understand that decision and the values underlying it. Thus, the informational benefits that might have resulted from the preparation of an EIR in this case would not have outweighed the expense and delay of the additional inquiry. (See Guidelines, § 15003, subd. (j) ["CEQA requires decisions to be informed and balanced" and must not be subverted into an instrument for oppression and delay].)

In conclusion, we do not believe the Legislature intended CEQA to be applied in a way that maximizes the expense and delay incurred before a final decision is reached about a building's historic significance and the propriety of demolition. Instead, the

Legislature intended that final discretionary decisions about whether a building was an historical resource be made during the early stages of environmental review.

E. Environmental Setting

Plaintiff argues that the Project is within an area that qualifies for designation as an historic district and the analysis of impacts of the Project did not begin with the current baseline of the unique L Street environmental setting. Plaintiff contends that, as a result, City's approval of the mitigated negative declaration did not proceed in the manner required by law.

Pages 60 through 62 of the mitigated negative declaration describe the historic importance of both the Project site itself and the surrounding area. Under the heading "Surrounding Area," the mitigated negative declaration identifies the five properties immediately to the west of the Project site that are designated on the local register. Next, the mitigated negative declaration describes the three reports prepared in connection with the proposal for an "L" Street Historic District and notes that the proposal has never been approved. The mitigated negative declaration states that the demolition of the Crichton and Sayre Homes would not impact the historical resources within the Project vicinity because (1) those resources do not rely on the Crichton and Sayre Homes for the characteristics that make them historic and (2) the completion of the Project would result in buildings similar to the existing surroundings because the new structures would use elements of the Arts and Crafts vernacular, which is visually consistent with the general surroundings.

We reject plaintiff's argument that City committed legal error in describing the environmental setting and using that description to analyze the impacts resulting from the project.

First, the description for the surrounding area is adequate because it lists the five nearby properties that are designated on the local register and describes the three survey reports and unsuccessful attempts to create an "L" Street Historic District. Thus, City

was adequately informed when it made the discretionary decision not to consider the area surrounding the Project to be an historical resource for purposes of CEQA.

Second, to the extent plaintiff's argument is based on the view that, under the fair argument standard, the surrounding area is a district that constitutes an historical resource, we have already decided that question of statutory interpretation against plaintiff. The statutory interpretation set forth in this opinion leads to the conclusion that the fair argument standard does not apply to the question whether the area surrounding the Project is an historical resource under CEQA. Accordingly, plaintiff's argument does not establish that City committed legal error when it determined that the area surrounding the project was not an historical resource for purposes of CEQA.

## DISPOSITION

The judgment and the writ of mandamus are affirmed. The parties shall bear their own costs on appeal.

City's request for judicial notice filed March 20, 2014, is granted. The court, on its own motion, takes judicial notice of the legislative history for Assembly Bill No. 2881 (Reg. Sess. 1991-1992), which was part of the appellate record in *Valley Advocates, supra,* 160 Cal.App.4th 1039.

_____

Franson, J.

WE CONCUR:


_____

Cornell, Acting P.J.


_____

Detjen, J.

35.