Filed 1/31/18

<u>**CERTIFIED FOR PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JOHN R. LAWSON ROCK & OIL, INC., et al.,<br><br>    Plaintiffs and Respondents,<br><br>        v.<br><br>STATE AIR RESOURCES BOARD et al.,<br><br>    Defendants and Appellants. | F074003<br><br>(Super. Ct. No. 14CECG01494)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County. Mark Wood Snauffer, Judge.

Xavier Becerra, Attorney General, Robert W. Byrne, Assistant Attorney General, Randy L. Barrow and Nhu Q. Nguyen, Deputy Attorneys General, for Defendants and Appellants.

Wanger Jones Helsley, Timothy Jones, John P. Kinsey, and Steven K. Vote for Plaintiffs and Respondents.

Dorothy Rothrock; Heather Wallace; and Michael Jacob for California Manufacturers & Technology Association, Automotive Specialty Products Alliance, California Business Properties Association, California Chamber of Commerce, California Independent Oil Marketers Association, California Professional Association of Specialty Contractors, California Retailers Association, Consumer Specialty Products Association,

National Elevator Industry, Inc., and Pacific Merchant Shipping Association as Amici Curiae on behalf of Plaintiffs and Respondents.

-ooOoo-

**OVERVIEW**

This case involves modifications to a set of regulations first adopted in 2008, known as the "Truck and Bus Regulation" (the regulations). In 2014, the State Air Resources Board (the Board) adopted proposed modifications to the Truck and Bus Regulation, extending certain deadlines for small fleet operators to comply with the regulations. John R. Lawson Rock & Oil, Inc. (Lawson), a fleet operator that had already incurred financial liability complying with the regulations, along with a related interest group, the California Trucking Association (collectively respondents), filed a writ petition against the Board and Richard Corey in his official capacity as Executive Officer of the Board (defendants and appellants) alleging the 2014 modifications were improper under both the California Environmental Quality Act (CEQA) and California's Administrative Procedures Act (APA).

The trial court ultimately ruled in respondents' favor on both claims. With respect to CEQA, the court concluded the Board made several errors, including approving a project prior to the completion of an environmental study, adopting the wrong baseline for its analysis, incorrectly concluding the modifications would have no significant adverse impact on the environment, and improperly applying a piecemeal approach to the environmental review. With respect to the APA, the trial court found the Board conducted an incomplete economic impact analysis.

For the following reasons we conclude the trial court correctly determined the Board's actions violated CEQA. We find, however, that the violations are narrower than found by the trial court. We further find the Board's conduct violated the APA, voiding the modified regulations. We therefore affirm the trial court's judgment on the grounds set forth below.

2.

## FACTUAL AND PROCEDURAL BACKGROUND

In January 2010 a regulatory scheme called the Truck and Bus Regulation, first passed in late 2008, became effective. (See Cal. Code Regs., tit. 13, § 2025.) The regulations are designed to reduce emissions of diesel particulate matter (PM), oxides from nitrogen (NOx), and greenhouse gases from large diesel vehicles. It does so, in part, by requiring vehicle owners to retrofit and upgrade existing vehicles to the equivalent of 2010 or newer model year engines.

Shortly before the regulations became effective, staff notified the Board that the ongoing global recession had substantially reduced overall trucking activity since the regulations were first envisioned, potentially warranting modifications to the expected regulations. The Board responded by delaying some reporting deadlines and requesting proposals for modifications to the regulations. The subsequent proposal resulted in certain modifications to the original regulations that would delay the initial compliance dates by a year and further defer engine replacements by two or more years for most fleets. These changes also eliminated a requirement that certain light trucks utilize a particulate matter filter and provided a 10-year window where only engines 20 years old, or older, would require modernization. The Board notes in its briefing that no legal challenges were filed against these modifications.

*The Contested Modifications*

In October 2013, the Board received a status update on the Truck and Bus Regulation. In this update, the Board was informed that staff had been working with regulated fleets to meet compliance deadlines. Staff reported that, while "the vast majority of the 260,000 trucks registered in California [that] must comply with the requirements of the regulation [were] already compliant," 20,000 trucks still needed a filter, of which nearly 15,000 were in small fleets of three or fewer. Staff identified January 1, 2014, as a critical upcoming milestone "because it's the first time at least one vehicle for each of these fleets need[s] to become compliant," while noting that "small

3.

fleets typically have least access to capital, creating additional challenges" toward compliance.

As part of this update, staff identified "what [the Board] is doing to assist fleets in transitioning into compliance as we approach the upcoming compliance date." Staff pointed to several funding programs available to assist fleets with required modifications and noted "[s]taff is also proposing some new regulatory flexibility to be added to the regulation." As part of this regulatory flexibility, staff indicated it was "proposing to issue a regulatory advisory that would provide fleets that order a [particulate matter] filter or a replacement truck or that are eligible and apply for a grant or a loan to have until July 1, 2014, to complete the steps necessary to come into compliance" and stated "because we are planning to make regulatory changes to provide relief, we believe it is appropriate to provide access to these provisions while staff finalizes them to present to the Board by April 2014." All these proposals were part of what staff described as "a comprehensive strategy which will help many of [the currently noncompliant] fleets transition into compliant trucks." Staff explained that, moving forward, "staff will assess the emission and economic impacts of proposed regulatory changes," and "return to the Board by April 2014 with proposed amendments." In the meantime, staff noted they would issue a regulatory advisory to allow fleet operators to take advantage of the planned flexibility. Based on this presentation, the Board indicated its staff should examine these changes while some members expressed thanks that flexibility was being built into the regulations.

The Board's Regulatory Advisory

In November 2013, the Board issued the expected Regulatory Advisory concerning its plans to modify the current regulations. The Regulatory Advisory described steps the Board "is taking to assist vehicle owners with the transition to the upcoming January 1, 2014, particulate matter . . . filter compliance deadline under the Truck and Bus [R]egulation" and expressed its overall goal as providing "additional time

4.

for owners to complete their good faith compliance efforts" and "additional flexibility for many lower use vehicles and vehicles that operate solely in certain areas of the State." The advisory explained the Board "will recognize good faith efforts of vehicle owners to comply with the deadline" then in place by ensuring those meeting relevant criteria "will not be subject to enforcement action during the period through July 1, 2014."

Truck owners were also allowed "to take advantage of the following anticipated regulatory changes for all vehicles" prior to the expected April 2014 hearing at which the matter would be again discussed. Staff outlined these anticipated changes as: (1) reopening the period for vehicles to opt-in to the existing low mileage agricultural vehicle extension; (2) reopening the period for vehicles to opt-in to the existing low mileage construction truck extension; (3) reopening the period for vehicles to opt-in to the existing particulate matter phase-in requirements; (4) increasing the thresholds for low-use exemptions; and (5) expanding the definition of " 'NOx exempt' " areas. Staff also explained that the "PM filter requirements for vehicles operated exclusively in the existing and newly proposed 'NOx exempt' areas . . . will be delayed one year until January 1, 2015." The advisory further explained that "while . . . staff anticipates proposing amendments similar to these administrative changes at the Board's regularly scheduled April 2014 meeting, the changes will not be finalized until approved by the Board." However, "[i]n the event that the proposed amendments differ from those identified above and impact a fleet's ability to comply with the regulation, . . . staff will provide fleets that have reported their intent to use these options additional time beyond the Board's April 2014 meeting to come into compliance."

The Initial Statement of Reasons

On March 5, 2014, the Board released a staff report, which included its Proposed Amendments to the Truck and Bus Regulation and its Initial Statement of Reasons for Proposed Rulemaking (initial statement). The initial statement provided recommendations for modifications in line with those discussed at the October 2013

5.

meeting and, relevant to this appeal, included distinct subsections discussing air quality, the environmental impacts analysis, and the economic impacts analysis and assessment. With respect to the disputed modifications, the initial statement sought to provide relief in areas with cleaner air by delaying the compliance schedule for all vehicles operating solely within certain exempt areas by one year for initial compliance and four years for final compliance. For small fleets outside of these areas, staff proposed "to defer the compliance requirements for the second and third truck in a small fleet by one year and two years, respectively. . . ." No changes were recommended regarding the first truck "because the January 1, 2014[,] compliance date has passed and many small fleet owners have already complied."

For fleets that had already complied with the prior particulate matter regulations, staff recommended extending the time they could use existing particulate matter retrofits, extending the use of credits with respect to the use of particulate matter filters, and allowing operators to continue operating if retrofitted particulate matter filters are recalled, all of which generally extended relevant deadlines for complying fleets. The credit program generally allowed trucks fitted with compliant particulate matter filters prior to 2012 to count against other trucks in the fleet that would otherwise need to be upgraded until the new deadlines were reached. The changes would also delay the point at which trucks outfitted with a particulate matter filter prior to 2014 would have to upgrade their engine to a 2010 model level.

The air quality section of the initial statement identified several reasons why reducing diesel particulate matter and black carbon—"a major constituent of diesel [particulate matter]"—was important nationally and locally, particularly in the South Coast and San Joaquin Valley regions. This section also included updated information about the types of trucks subject to regulation and their use in California. In conjunction with Appendix F to the initial statement, the air quality section explained that current pollution estimates now included "up-to-date (2013) fuel sales and use data," the "latest

nationwide truck sales projected in the Annual Energy Outlook," improved matching of engine and truck model years from prior estimates, and updated information "on how truck owners are actually complying" with the previously passed regulations. The air quality section then provided several charts showing how oxides of nitrogen and particulate matter emissions would decrease from the current levels estimated under the updated methodology and compared those reductions to the estimated reductions if the current regulations were left in place. As one example of how this data was presented, the below chart shows how the current data regarding particulate matter emissions (marked as the "Without Truck and Bus Regulation" line) compares to the data "With Adopted Regulation" and "With Proposed Amendments."



**Figure IV-4: Statewide Truck and Bus PM2.5 Emissions***

Legend: –■–Without Truck and Bus Regulation –◆–With Adopted Regulation –▲–With Proposed Amendments

*Vehicles subject to either the Truck and Bus or Drayage Truck regulations

The environmental impact analysis section disclosed the staff's opinion "that implementing the proposed amendments to the regulation would not result in an adverse impact on the environment" and explained the staff's process for making this determination. In discussing air quality benefits under this section, the initial statement noted that "staff projects a temporary delay in some emission benefits in the near term (until 2020) compared to emission benefits that may have been achieved absent the proposed amendments," but found that impact "minimized by the fact that overall emissions continue to be lower than originally expected due to the continued effects of the economic downturn." The initial statement then referred to the air quality section for further details. Reaching the heart of its conclusion, the initial statement then explained, "The amendments only change the mid-term timing of clean-up of the truck fleet and, therefore, do not result in any increase in emissions compared to existing environmental conditions. Also, despite the projected near-term delay in some emissions benefits . . . emissions . . . will continue to drop from today's levels as a result of the regulation with the proposed amendments and it will ultimately result in the same projected air quality benefits." In similar language, when discussing " 'NOx exempt areas,' " the initial report stated, "Although emissions would not decline as rapidly, in these regions, trucks that travel in these areas would continue to meet the full requirements of the regulation and both NOx and PM emissions will continue to decline. Since there is no longer a need to substantially decrease NOx emissions in these attainment areas, no adverse impacts to air quality would occur . . . ." Ultimately, the section concluded that because "no significant adverse environmental impacts were identified, this environmental analysis does not include a discussion of mitigation measures or environmental alternatives."

Finally, the economic impacts analysis and assessment section claimed to discuss "the effect of the proposed amendments on individual fleet owners and businesses affected by the regulation." It generally concluded that the amendments "would reduce compliance costs for many fleet owners" by allowing "fleet owners more time to make

8.

the required upgrades, thereby providing time for used compliant truck prices to naturally decline." The section then discussed numerous expected costs, including vehicle price and replacement costs, retrofitting particulate matter filter costs, and other similar matters associated with the regulations. Within these analyses, staff considered things such as differences in impact between in-state and out-of-state fleets, differences in impact on high-mileage fleets, and annual operational, maintenance, and reporting costs. The section further considered the specific impact the modifications had on small businesses within California, noting "the proposed amendments would not impose any additional costs on small businesses, and should result in small businesses, many of them small fleets, being able to spread out" their compliance costs. At the same time, the section explained "the [amendments] could have a negative economic impact on retrofit manufacturers and installers," among others.

As part of the economic analysis, staff completed a Standardized Regulatory Impacts Assessment (standardized assessment or SRIA), which was ultimately submitted to the Department of Finance for review and approval. Included within this assessment was a discussion of costs and cost savings arising from the proposed amendments. In its discussion on the costs and cost savings for businesses, staff concluded, "The businesses required to comply are throughout the state of California, while all regulated businesses can benefit from the compliance delays, the businesses that have already complied would not be affected." The report did not identify any analysis supporting this conclusion. In a later section on macroeconomic impacts, the assessment looked at competitiveness and job impacts in California, among other factors. Here, when discussing competiveness, the assessment focused on "competitive advantage[s] of businesses outside of California to those in California" and found "no direct impact on competitiveness." The report noted that, while some businesses "have indicated that the compliance requirements would negatively impact their ability to achieve the necessary profits to stay in business," the amendments were designed "to provide the flexibility necessary to ensure these

9.

businesses are not eliminated" and the "strategy will be beneficial for California due to a favorable change in the trade balance between California and the rest of the world . . . ." With respect to job impacts, the assessment found there would "be no net loss in jobs over the life of the proposed Amendments," while noting there may be an immediate lower demand for trucks and exhaust retrofit devices, resulting in some job losses for those service providers.

### Comments, Responses, and Approvals

Following release of the initial statement, the Board solicited and received public comments on its proposals. These comments included several from Lawson, which raised the issues litigated in this matter.

On April 24, 2014, the Board held another public meeting, at which time it was updated on the status of its proposed modifications. In that presentation, staff recommended adopting the proposed modifications with several non-substantive changes requiring a 15-day public comment period under the APA. The Board adopted this recommendation and initially approved the modified regulations by way of Resolution 14-3, on April 25, 2014. As part of this approval, the Board approved and released written responses to comments on the environmental impacts analysis related to the modified regulations, rejecting all public criticisms of the document.

When providing the 15-day comment period, and a second 15-day comment period required after additional changes were made that increased compliance times for the second truck in a small fleet, among other matters, the Board noted that staff "has determined that these modifications do not change implementation of the regulation in any way that alters any of the conclusions of the environmental analysis . . . included in the Staff Report released on March 5, 2014," and that the "modifications do not cause any changes that alter the air quality emissions assessment or otherwise result in any other significant adverse environmental impacts . . . ."

10.

Following these comment periods, the Board held another public meeting and received another update on the modifications. The staff update noted the original environmental analysis found no adverse environmental impacts and the 15-day changes did not alter that conclusion. Staff noted additional environmental comments had been received and responded to and recommended reaffirming the Board's finding of no adverse environmental impact and adopting the final regulation order.

On November 20, 2014, the Board issued Resolution 14-41, adopting the final regulation order for the modified regulations and the written responses to the environmental and economic comments previously discussed. In line with this action, the Board issued its Final Statement of Reasons for Rulemaking, which incorporated the initial statement and provided written responses to all the comments received from the public. Included in these comments were dozens of assertions that the proposed modifications were harmful to fleets that had already complied with the prior regulations. In response to these comments, the Board wrote it "was concerned with small fleets, lower mileage fleets, and fleets in rural areas with cleaner air, all which arguably continue to be impacted by the recession and are challenged in complying with the regulation. In considering changes, the Board carefully considered various options to find the best balance in providing additional flexibility for such fleets while minimizing the impacts to compliant fleets and retaining the air quality benefits of the regulation. [The Board] recognizes that to those fleets that have already made investments to comply, providing additional flexibility can be viewed as unfair. However, most of the amendments were structured in a manner that would minimize the impact on such fleet owners that compete in the same markets. The amendments also included changes that reward fleets that have acted early and have already complied." The Board then pointed to responses to multiple related comments to support this claim. These additional responses included statements suggesting the Board considered the alleged impacts, such as, "The Board determined the amended regulation achieves the appropriate balance in

11.

addressing concerns about competitive disadvantage and protecting public health while still meeting air quality obligations." The Board also suggested it did not make certain changes to avoid significant competitive disadvantage concerns, writing "The Board determined that it was not appropriate to expand the definition [of certain work trucks] to include tractor-trailers because the amendments would no longer meet air quality objectives, and would create competitive disadvantage concerns among most for-hire fleets."

*The Present Proceedings*

On May 23, 2014, respondents filed their initial petition for a writ of mandate and complaint for declaratory and injunctive relief based on the Board's conduct to that point. The petition and complaint was amended in July 2014 and faced a quick demurrer on the grounds that the regulatory proceedings were not complete. On December 23, 2014, after the Board issued its final approval, respondents filed a second amended petition and complaint, which remains the operative pleading in this case.

The trial court held hearings on September 18 and October 16, 2015, before issuing its Final Statement of Decision on June 7, 2016. The trial court first concluded the Board engaged in post hoc environmental review by approving amendments before the environmental review process was complete. The court reasoned the Board began carrying out and implementing the proposed amendments as early as November 2013, and the Board's April 25, 2014, approval was also premature given that additional environmental review remained. The court next found the Board should have prepared the functional equivalent of an environmental impact report (EIR), rather than adopt the proposed equivalent of a negative declaration, because a fair argument existed in the record that the amendments would have a significant effect on the environment. The court found substantial evidence showed potential increases in oxides of nitrogen, particulate matter, and greenhouse gases. In addition to these findings, the court also concluded the Board adopted an incorrect baseline for determining impacts on the

12.

environment because it did not utilize as a baseline measurement, "what would obtain under the unmodified 2010 Amendments" and instead used "the current conditions obtaining due to lack of enforcement of the 2010 Amendments." The court rejected the notion that a negative declaration could be utilized in the future in light of the fact "the criteria pollutant emissions caused by the Amendments vastly exceed[ed] the thresholds of significance" for oxides of nitrogen and particulate matter. Finally, the court found the Board had also violated the APA by utilizing a materially deficient economic impact analysis. The court found that, despite numerous comments on the issue of competitive impacts on compliant fleets, "there is no analysis in either the SRIA or the Fiscal Statement of the impacts to compl[ia]nt trucking companies being undercut in the market by non-compliant trucking companies due to the Amendments."

Based on these findings, the trial court granted respondents' writ petition, voided the Board's approval of the 2014 Amendments to the Truck and Bus Regulation and certification of the environmental documents related to the 2014 Amendments, and issued a peremptory writ of mandamus to the Board ordering it "to comply with CEQA and the APA before taking any further action to approve, implement or enforce the 2014 Amendments." The court denied respondents' request for declaratory relief and awarded respondents their fees and costs.

This appeal timely followed.

## DISCUSSION

### *Alleged CEQA Violations*

The underlying writ petition includes multiple allegations of error under CEQA. Although we need not reach every allegation, our ultimate finding of CEQA error requires us to consider several alleged errors in order to ensure future compliance with CEQA should the Board continue to pursue modifications to the current regulations. Accordingly, we begin by identifying some basic CEQA principles, before analyzing those alleged errors.

13.

*CEQA and the Board's Regulatory Program*

The Board is not subject to the full scope of CEQA. Rather, it utilizes its own regulatory program when adopting or amending standards for the protection of ambient air quality. This process is permitted under the law as a certified regulatory program. (See Pub. Resources Code, § 21080.5; Cal. Code Regs., tit. 14, §§ 15250-15252.) Such programs are exempt from certain procedural aspects of CEQA because "they involve 'the same consideration of environmental issues as is provided by use of EIRs and negative declarations.' " (*POET, LLC v. State Air Resources Bd.* (2013) 218 Cal.App.4th 681, 709 (*POET I*).) Certification of a program is effectively a determination that the agency's regulatory program includes procedures for environmental review that are the functional equivalent of CEQA. (*Californians for Alternatives to Toxics v. Department of Pesticide Regulation* (2006) 136 Cal.App.4th 1049, 1059.) "The practical effect of this exemption is that a state agency acting under a certified regulatory program need not comply with the requirements for preparing initial studies, negative declarations or EIR's. [Citations.] The agency's actions, however, remain subject to other provisions of CEQA." (*POET I*, *supra*, 218 Cal.App.4th at p. 710.)

The Board's "regulatory program is contained in sections 60005, 60006 and 60007 of title 17 of the California Code of Regulations. These provisions require the preparation of a staff report at least 45 days before the public hearing on a proposed regulation, which report is required to be available for public review and comment. (Cal. Code Regs., tit. 17, § 60005, subd. (a).) It is [the Board's] policy 'to prepare staff reports in a manner consistent with the environmental protection purposes of [the Board's] regulatory program and with the goals and policies of [CEQA].' (Cal. Code Regs., tit. 17, § 60005, subd. (b).) The provisions of the regulatory program also address environmental alternatives and responses to comments to the environmental assessment. (Cal. Code Regs., tit. 17, §§ 60006, 60007.)" (*POET I*, *supra*, 218 Cal.App.4th at p. 710.)

14.

Although the Board follows slightly different procedures, we analyze the Board's conduct for compliance with CEQA's policies and legal mandates. (*POET I*, *supra*, 218 Cal.App.4th at p. 711.)

*General Standards of Review*

In reviewing an agency's compliance with CEQA during the course of its legislative or quasi-legislative actions, the trial court's inquiry during a mandamus proceeding " 'shall extend only to whether there was a prejudicial abuse of discretion,' " which is established " 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' " (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426 (*Vineyard*), citing Pub. Resources Code, § 21168.5.) We apply the same standard when reviewing a substitute environmental document for a certified regulatory program. (*POET I*, *supra*, 218 Cal.App.4th at pp. 712-713; *California Sportfishing Protection Alliance v. State Water Resources Control Bd.* (2008) 160 Cal.App.4th 1625, 1644 (*California Sportfishing*).)

"In evaluating an EIR [or substitute environmental document] for CEQA compliance, . . . a reviewing court must adjust its scrutiny to the nature of the alleged defect, depending on whether the claim is predominantly one of improper procedure or a dispute over the facts." (*Vineyard*, *supra*, 40 Cal.4th at p. 435.) When the claim is predominantly one of procedure, courts conduct an independent review of the agency's action, but when a challenge is made to a factual finding of the agency, we will review the record to determine whether the finding is supported by substantial evidence. (*POET I*, *supra*, 218 Cal.App.4th at p. 713.) When the informational requirements of CEQA have not been met, an agency has failed to proceed in a manner required by law and has therefore abused its discretion. (*California Sportfishing*, *supra*, 160 Cal.App.4th at p. 1644.) In assessing such a claim, courts apply an independent or de novo standard

15.

of review to the agency's action. (*Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70, 83.)

On appeal, we review the agency's action rather than the trial court's ruling, applying the same standard as the trial court. (*Vineyard*, *supra*, 40 Cal.4th at p. 427.) "We therefore resolve the substantive CEQA issues . . . by independently determining whether the administrative record demonstrates any legal error by the [agency] and whether it contains substantial evidence to support the [agency's] factual determinations." (*Ibid.*)

*The Board's Approval of the Modifications*

Although the Board is not subject to the full extent of CEQA regulations when utilizing its certified regulatory program, it is subject to various CEQA principles relevant to its regulatory actions. One of these principles is the expectation that CEQA documents, and by extension CEQA compliant documents like the Board's staff report, "be considered *before project approval*." (*POET I*, *supra*, 218 Cal.App.4th at p. 716.) As explained in the CEQA Guidelines, "public agencies shall not undertake actions concerning the proposed public project that would have a significant adverse effect or limit the choice of alternatives or mitigation measures, before completion of CEQA compliance." (CEQA Guidelines[1], § 15004, subd. (b); see *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 394 ["A fundamental purpose of an EIR is to provide decision makers with information they can use in deciding *whether* to approve a proposed project, not to inform them of the environmental effects of projects that they have already approved. If postapproval environmental review were allowed, EIR's would likely become nothing more than *post hoc* rationalizations to support action already taken."]) The Board is subject to this same

---

[1] "CEQA Guidelines" refers to the regulations that implement CEQA and are set forth in California Code of Regulations, title 14, section 15000 et seq.

16.

timing requirement. (*POET I*, *supra*, 218 Cal.App.4th at p. 717 ["[W]e conclude that certified regulatory programs, while exempt from certain requirements of CEQA, are not exempt from the timing requirement in Guidelines section 15004."].)

The parties dispute whether the Board satisfied this timing requirement. According to respondents, the Board took two distinct steps that committed it to a definite course of action with respect to the proposed modifications. First, respondents contend the Board violated CEQA when its staff issued Regulatory Advisory 13-28 in November 2013. Respondents argue the Board necessarily limited its choice of alternatives or mitigation measures and committed itself to a definite course of action on the modifications when it issued an advisory telling fleet owners they could " 'report and *take advantage of* applicable anticipated regulatory changes.' " Second, respondents see a CEQA violation at the time the Board first approved the Amendments at the April 25, 2014, meeting. Respondents posit that the Board's CEQA review was not complete, according to regulatory rules, until the Board filed a Notice of Decision, which did not occur until November 2014, and that the approval in April 2014 included language demonstrating the environmental review was ongoing.

The Board disagrees. With respect to its conduct in issuing the Regulatory Advisory, the Board argues the advisory itself was not a project and did not bind the Board to adopting the proposed amendments or preclude consideration of alternatives. Rather, the Board states that it "was simply allowing vehicle owners an opportunity to report their intent to use amended provisions if they became available and be eligible for some delay in enforcement, if they reported that intent," conduct the Board contends is perfectly acceptable given its inherent discretion "to determine where, when, and how to utilize its enforcement resources." It further suggests any error at this stage is "moot and irrelevant because by the time the writ petition was filed, [the Board] did in fact conduct the full CEQA review of the proposed regulatory modifications." On the matter of its April 2014 approval, the Board's position is that it met all CEQA requirements prior to

17.

the April 2014 approval and that respondents are mistaking routine boilerplate language in its notice of approval for an admission that further environmental review was applicable. The Board asserts no further CEQA analysis was required after that point and further meetings were held only to comply with certain requirements of the APA.

<u>The Board Violated CEQA by Approving a Project Too Early</u>

We begin with analyzing the Board's conduct when issuing the Regulatory Advisory. We ultimately find this action constituted the approval of a project under CEQA. Contrary to the framework of the Board's arguments, the project in this instance was not the advisory, but the proposed regulatory modifications. The Board's issuance of a public Regulatory Advisory stating that fleet operators could take advantage of the proposed regulatory modifications before they were enacted, and would not be subject to enforcement actions or penalties if those modifications were not enacted, is sufficient conduct to constitute approval of those regulations under CEQA. As the required environmental review was incomplete at the time of the CEQA project approval, the Board violated CEQA's timing requirement.

A project is a broad concept under CEQA that asks whether certain entities' activities " 'may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment.' " (*Friends of the Sierra Railroad v. Tuolumne Park & Recreation Dist.* (2007) 147 Cal.App.4th 643, 653.) Analogous to this case, "[t]his means that agency action approving or opening the way for a future development can be part of a project and can trigger CEQA even if the action takes place prior to planning or approval of all the specific features of the planned development." (*Id.* at p. 654.) This "opening the way" can trigger CEQA where it constitutes an approval.

Although we agree with the Board that issuing the Regulatory Advisory itself did not constitute a project, this does not end our inquiry. The modification of current

18.

regulations may constitute a project. (*POET, LLC v. State Air Resources Bd.* (2017) 12 Cal.App.5th 52, 73-74 (*POET II*).)

Prior to issuing the Regulatory Advisory, staff identified proposed modifications to the current framework of the Truck and Bus Regulation, modifications it called a comprehensive compliance strategy. The Board and its staff then indicated their intent not to prosecute those that failed to comply with the current controlling regulations if they identified their intent to comply with the expected proposal. The potential modifications were sufficiently detailed to allow staff to indicate they would quickly present modifications based on their presented outline to the Board and could rely on that outline as a basis for choosing not to enforce the present regulations. Such a plan is certainly detailed enough to constitute a project which cannot be approved without CEQA compliance. (See *Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 130 (*Save Tara*) [noting an EIR may not "be delayed beyond the time when it can, as a practical matter, serve its intended function of informing and guiding decision makers"].) Thus, under CEQA's timing requirement, we must consider whether the Board improperly approved this project prior to the completion of the required environmental analysis.

While the Board contends no project approval could exist prior to the formal approval from the Board, this is not correct. An approval under CEQA is "the decision by a public agency which commits the agency to a definite course of action in regard to a project intended to be carried out by any person." (CEQA Guidelines, § 15352, subd. (a).) "Generally speaking, an agency acts to approve a proposed course of action when it makes its earliest firm commitment to it, not when the final or last discretionary approval is made." (*North Coast Rivers Alliance v. Westlands Water Dist.* (2014) 227 Cal.App.4th 832, 859, italics omitted.) Approvals under CEQA, therefore, are not dependent on "final" action by the lead agency, but by conduct detrimental to further fair environmental analysis.

19.

Our Supreme Court provided an extensive analysis of this principle with respect to public/private development agreements in *Save Tara*. In that case, the city council for West Hollywood entered into a development agreement that was contingent on later CEQA review and other regulatory approvals. (*Save Tara*, *supra*, 45 Cal.4th at pp. 123-124.) The court found this agreement violated CEQA's timing requirement, noting in its analysis that the agreement included a loan not conditioned on CEQA compliance, that the city had made several statements suggesting it was committed to the project (*Save Tara*, *supra*, at pp. 140-142), and that the "[c]ity [had] proceeded with tenant relocation on the assumption the property would be redeveloped as in the proposed project" (*id*. at p. 142).

In its discussion regarding the general principles of CEQA's timing requirement, the Supreme Court explicitly rejected the city's argument that approval could not occur until the relevant agency entered into an unconditional agreement irrevocably vesting development rights. (*Save Tara*, *supra*, 45 Cal.4th at p. 134.) In language pertinent to this case, the court noted it had previously found approval "even though further discretionary governmental decisions would be needed before any environmental change could occur" (*ibid*.) and explained that limiting approval to unconditional agreements would ignore situations where bureaucratic and financial momentum had built irresistibly behind a proposed project, creating a strong incentive to ignore environmental concerns. (*Id.* at p. 135.) Notably, however, the court also rejected the idea that any agreement, conditional or not, would constitute approval, stating specifically that approval "cannot be equated with the agency's mere interest in, or inclination to support, a project, no matter how well defined." (*Id.* at p. 136.) Balancing these positions, the court concluded the proper test for determining whether a project had been prematurely approved was whether the agency had taken any action that significantly furthered a project " 'in a manner that forecloses alternatives or mitigation measures that would ordinarily be part of CEQA review of that public project,' " including "the alternative of not going forward

with the project." (*Id.* at pp. 138-139.) The court instructed reviewing courts to look "not only to the terms of the agreement but to the surrounding circumstances" when making this determination. (*Id.* at p. 139.)

The core principles set forth in *Save Tara* equally apply to public regulatory action, such as the proposed amendments at issue here. (*POET I*, *supra*, 218 Cal.App.4th at p. 719.) While the facts shedding light on the agency's rule-making process will be different from those arising when an agency approves a development agreement, such differences are immaterial to the core issue whether the agency has taken any steps foreclosing alternatives, including that of not going forward, or has otherwise created bureaucratic or financial momentum sufficient to incentivize ignoring environmental concerns.

Under that standard, we conclude the Board did take action that significantly furthered the proposed regulations in a manner that foreclosed the alternative of not modifying the regulations. As the Board notes in its briefing, it was updated on issues regarding full implementation of the existing regulations in October 2013. At that time it was informed compliance was required by January 1, 2014, and that many small fleets were facing economic challenges in meeting this deadline. In response to this information, the Board directed its staff to propose modifications to the regulations. While such conduct certainly built momentum behind a change to the regulations, such momentum was well in line with *Save Tara*'s reminder that agencies may express interest in or even inclination toward proposed projects.

However, shortly after providing those instructions, staff responded, in November 2013, with draft modifications and an advisory to the public regarding the proposal. While the advisory informed the public that further action by the Board was necessary to implement any changes, and warned that the Board and staff may propose amendments, it expressly stated that, should modifications occur that "impact a fleet's ability to comply with the regulation, [the Board's] staff will provide fleets that have reported their intent

21.

to use these options additional time beyond the Board's April 2014 meeting to come into compliance." Thus, at the point of the November 2013 advisory, the Board, through its staff's statements, had confirmed it intended to change the current regulations and that it would not prosecute any fleet operator that failed to comply with those 2014 regulations between January 1, 2014, and the April 2014 board meeting. In related public comments, members of the Board were already expressing their gratitude for the forthcoming "flexibility" to the regulations.

We conclude such conduct qualifies as approval of the modified regulations under CEQA. While the Board had previously expressed an inclination to modify the regulations, its advisory made clear that, at some level, changes were coming. It thus put substantial momentum behind supporting the changes offered by staff, as written, even if it retained a stated authority to modify those recommendations. This momentum was further buttressed by an express and public confirmation that the regulations as currently drafted would not be enforced. This expression of intent wholly precluded any potential "not going forward" option, as even if the Board found a reason not to make changes it would have already delayed implementation of the regulations as written by at least four months, thereby ensuring that at least some reduction in environmental impact under the pending regulations would not occur.

The Board argues that such a conclusion cannot stand because the Board was merely exercising its well-settled powers of prosecutorial discretion with respect to regulatory enforcement. Noting there is no case law on record suggesting the Board's "exercise of its prosecutorial discretion is constrained by CEQA," the Board argues there "is no evidence in the record that this temporary forbearance was likely to have any impact on the environment or otherwise constituted a project under CEQA." This argument is fundamentally flawed. Our conclusion in this matter does not add new limits to the Board's exercise of prosecutorial discretion, rather it enforces the limits CEQA places on all Board actions that approve projects under that overarching law. This is no

different than occurred in *Save Tara*, where the agency was utilizing its uncontested authority to enter into contracts but did so in a manner that improperly approved a project under CEQA. (*Save Tara*, *supra*, 45 Cal.4th at p. 140.) It is, likewise, no different from how the board prematurely approved the Low Carbon Fuel Standard in *POET I* even though the board-approved modifications were subject to further comment and potential change. (*POET I*, *supra*, 218 Cal.App.4th at pp. 722-726.) In all such cases, there is no curtailment to the agency's ability to use a power generally. Rather, the law requires the agency to consider when it can properly use that power such that it does not purposefully or inadvertently sidestep the mandatory provisions of CEQA.

As the Board cited in its own briefing, "[a] decision to devote available facilities and personnel to selected areas and to abstain from active pursuit of others is a policy or planning decision at a relatively high internal level." (*Roseville Community Hosp. v. State of California* (1977) 74 Cal.App.3d 583, 590.) To ignore the impact of such a high level policy decision in analyzing approval under CEQA would directly contradict our Supreme Court's guidance in *Save Tara* to review not only the specific actions taken but also the surrounding circumstances when considering approval of a project. (*Save Tara*, *supra*, 45 Cal.4th at p. 139.) Whether such additional circumstances have any independent impact on the environment or otherwise constitute a project is a true red herring. The sole question under the law is whether some action constituted approval of a CEQA project. The project here is the ultimate modification of the Truck and Bus Regulation. Thus, the only relevant question is whether the Board took meaningful steps in support of that project, thereby foreclosing alternatives. As noted above, in this case we conclude such steps were taken prior to the Board conducting its environmental analysis, violating CEQA.[2]

---

[2]     Having concluded the Board improperly approved this CEQA project at the time it issued its Regulatory Advisory, we do not further consider whether its actions on April 25, 2014, also prematurely approved the modifications. Further, we need not reach

23.

<u>Remedy for Early Approval</u>

"Directing an agency to void its approval of the project is a typical remedy . . . for a CEQA violation." (*POET I*, *supra*, 218 Cal.App.4th at p. 759.) This is what the mandate issued by the trial court ordered, along with a direction that the Board "comply with CEQA and the APA before taking any further action to approve, implement or enforce the 2014 Amendments." The parties do not dispute that affirming the trial court supports voiding the approval of the modifications under CEQA. However, the Board raised as an issue whether it would be required to prepare the functional equivalent of an EIR under the trial court's Final Statement of Decision.

We conclude that, to the extent the trial court intended to specifically order the preparation of the functional equivalent of an EIR, it erred. We note, however, that the court's actual judgment imposes no direct requirement to do so. We consider this issue, however, based on the parties' competing interpretations.

Public Resources Code section 21168.9 controls the court's authority when crafting a remedy for CEQA violations. (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1121 (*Berkeley Hillside Preservation*).) Under this statute, upon finding a CEQA violation, "a court should enter an order that includes (1) a mandate that the decision be voided in whole or in part, and/or (2) a mandate that the agency 'take specific action as may be necessary to bring the . . . decision into compliance with' CEQA." (*Berkeley Hillside Preservation*, *supra*, at p. 1121.) However, "subdivision (c) of [Public Resources Code] section 21168.9 provides in part that '[n]othing in this section authorizes a court to direct any public agency to exercise its discretion in any particular way.' " (*Id.* at p. 1122.) Thus, where no discretion remains for the agency, courts have properly instructed them to prepare an EIR when required.

whether improper piecemeal review occurred, as the initial approval was improper standing alone.

24.

(*Id.* at p. 1121; see *Save Tara*, *supra*, 45 Cal.4th at p. 143.) However, where the agency retains discretion on how to proceed under CEQA despite its previous violations, it may exercise that discretion on remand. (*Berkeley Hillside Preservation*, *supra*, 60 Cal.4th at p. 1122.) Thus, courts can order an EIR only where, under the circumstances of that case, the agency lacks discretion to proceed in a different fashion. (*Ibid.*)

In this case, we do not believe the Board lacks discretion to act in compliance with CEQA without generating the functional equivalent of an EIR.[3] As the Board notes, it may choose to revert to the prior regulatory scheme, effectively choosing the no project option. In addition, in light of its analysis of the errors identified below, it remains possible the Board could issue something similar to a mitigated negative declaration or could modify the regulations in a manner that avoids the environmental impacts identified by respondents. The trial court's judgment accounts for this possibility, simply directing the Board to comply with CEQA and the APA as it exercises its discretion moving forward. We affirm that understanding of the judgment.

*The Board's Choice of a Baseline*

Although the Board's early approval requires that we void approval of the contested modifications, as we have noted the Board may continue to pursue those or similar modifications. As such, we turn to the actual environmental analysis completed to determine whether it ultimately complied with CEQA. In this review, the parties first dispute whether the Board adopted a baseline determination of the environmental conditions absent the proposed project that is consistent with CEQA.

---

[3] We accept the Board's concession that it is obligated to proceed to the functional equivalent of an EIR if it "decided to re-adopt the amendments without any modifications using the exact same record." Moreover, in light of the errors identified below, we do not agree that the Board's later approval of the modifications permits us to overlook any other errors in this case. (See *POET I*, *supra*, 218 Cal.App.4th at pp. 759-760.)

Standards of Review and Applicable Law

The baseline determination is an important component of the CEQA process, as it sets the criterion by which the agency determines whether the proposed project has a substantial adverse effect on the environment. (*POET II*, *supra*, 12 Cal.App.5th at p. 78.) We review de novo whether an agency has chosen to rely upon a standard that is consistent with CEQA. (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 319 (*Communities*); *Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 62 Cal.4th 204, 219 (*Center for Biological Diversity*).) Once that standard is set, "an agency enjoys the discretion to decide, in the first instance, exactly how the existing physical conditions without the project can most realistically be measured, subject to review, as with all CEQA factual determinations, for support by substantial evidence." (*Communities*, *supra*, 48 Cal.4th at p. 328; *Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 449 (*Neighbors*).)

The Board Selected an Appropriate Baseline

The arguments presented on appeal walk a tightrope between the two standards of review noted above. Both parties agree, consistent with the case law, the Board should normally adopt as a baseline "the physical environmental conditions in the vicinity of the project, as they exist . . . at the time the environmental analysis is commenced . . . ." (CEQA Guidelines, § 15125; see *Communities*, *supra*, 48 Cal.4th at p. 321 ["[T]he impacts of a proposed project are ordinarily to be compared to the actual environmental conditions existing at the time of CEQA analysis, rather than to allowable conditions defined by a plan or regulatory framework."].) However, according to respondents, the Board "did not employ this standard to its environmental analysis" because it "created a fictional universe in which the Existing Regulations did not exist," measuring the current environment without regard to expected reductions in future pollution based on the existing regulations.

26.

Regardless of where the arguments fall specifically, we do not agree with respondents that the Board either adopted a baseline that was inconsistent with CEQA or erroneously measured the existing conditions by excluding future expected declines. Rather, we conclude the Board was within its discretion to adopt a baseline calculation that measured the current environment without further reducing figures based on regulations that should have taken effect during the course of the analysis.

*Communities* provides strong support for our conclusion. Like our case, *Communities* involved an agency issuing a negative declaration. However, in that case, the declaration arose because the baseline chosen for the project was the operation of certain boilers at their full permitted operational levels, despite the fact simultaneous maximum operation was not a realistic description of the existing conditions at the time. (*Communities*, *supra*, 48 Cal.4th at p. 322.) As we noted above, the Supreme Court explained "that the impacts of a proposed project are ordinarily to be compared to the actual environmental conditions existing at the time of CEQA analysis, rather than to allowable conditions defined by a plan *or regulatory framework*." (*Id.* at p. 321, italics added.) This was so because "[a]n approach using hypothetical allowable conditions as the baseline results in 'illusory' comparisons that 'can only mislead the public as to the reality of the impacts and subvert full consideration of the actual environmental impacts,' a result at direct odds with CEQA's intent." (*Id.* at p. 322.)

In line with *Communities*, the administrative record in this case demonstrates that full compliance with the existing regulatory standards would also create an illusory comparison. The record basis for proposing a delay in the regulatory mandates was the recognized fact that limitations in credit and capital had left many small fleet operators unable to comply with the standards as written. There were many who had not yet complied and it takes no unrealistic inference to recognize that future emissions estimates based on full compliance would mislead the public as to the effectiveness of the current regulations. Indeed, the natural unevenness in implementation and enforcement of

27.

regulations means regulatory expectations based on full compliance are rarely likely to accurately identify the current environmental conditions relating to those regulations. Nor should such predictions be used. CEQA is not meant to stand as a barrier to appropriate modifications to environmental regulations, whether they tighten or loosen existing regulations, provided the lead agency properly informs the public of the effects of those modifications and no significant environmental impact will arise. (See *Neighbors*, *supra*, 57 Cal.4th at p. 453 [noting the primary purpose an EIR is to provide " 'public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment' "].) Respondents' insistence that current existing conditions must account for those trucks that should comply with regulations in the future, but as of yet have not, suffers from the same flaw as the decision in *Communities* to rely on permitted standards that have not been utilized previously, differing only in whether the decision artificially inflates or deflates the appropriate baseline. Both metrics assume future potential conditions rather than evaluate the actual current environmental conditions.

Although respondents seek to distinguish *Communities* in the context of this argument, they do so by arguing the trial court "found that the ' "existing conditions" included the [Existing Regulations], and the emissions reductions that could be expected from enforcement of that regulation.' " This argument adds no weight to respondents' positions. We do not review the trial court's action, nor do we defer to the trial court's findings in these matters. (*Center for Biological Diversity*, *supra*, 62 Cal.4th at p. 215 ["In determining whether there has been an abuse of discretion, we review the agency's action, not the trial court's decision."].) As our analysis of *Communities* shows, existing conditions do not properly include expected regulatory reductions. Including such predictions in the baseline adds a potential for gamesmanship and misdirection to the analysis and creates a scenario whereby the relevant conditions are no longer statically defined or tied to the existing circumstances at the beginning of the review.

Likewise, we find substantial evidence supports the Board's decision to measure current existing conditions without reference to future expected reductions based on existing regulations. As a matter of logic, future expected reductions are not inherently relevant to a measurement of existing conditions in the same way that constantly fluctuating conditions, such as existed in *Communities*, *supra*, 48 Cal.4th at pages 327-328, would be to ensuring decision makers are provided adequate information on the project's impacts. Thus, the Board was within its discretion to determine reliance on such factors when measuring the baseline was not proper. Moreover, the record before us demonstrates that these expected reductions were already in jeopardy due to financial costs associated with upgrading existing vehicles not in compliance and the continued issues with availability of capital for small fleets following the global recession. The Board was considering alternatives to the regulations based on this evidence and we conclude such information constitutes substantial evidence supporting the Board's decision to measure based exclusively on current outputs.

Ultimately, we take no issue with respondents' statement that "[p]lainly, the 'existing environmental conditions' include applicable laws and regulations," but such a recitation does not prove the error respondents pursue. By adopting as a baseline the current environmental conditions, the Board did take into account the applicable laws and regulations as they had affected the environment to that point in time. Indeed, the initial report noted in Appendix F the many ways the Board updated its analysis to determine the most current environmental conditions. That the Board properly exercised its discretion when not adjusting its baseline to include speculative future reductions based on expected implementations under those laws and regulations does not mean those laws and regulations were retroactively excluded from the Board's baseline analysis. We find no error in this methodology.

29.

*Possibility the Project Will Substantially Impact the Environment*

Having determined the Board adopted a proper baseline, we next consider whether respondents produced any evidence supporting a fair argument that the project would have a substantial impact on the environment. In doing so, we take up respondents' related argument concerning how CEQA Guidelines, section 15125, subdivision (e) impacts the Board's decision not to consider a temporary increase in pollutants significant. Although we conclude the Board properly determined there would be no substantial impact on the environment under the significance standards it chose to apply, we find a fair argument exists that the project will impact the environment in the short term. We further recognize the Board may not rotely apply standards of significance that do not address that potential effect once evidence of the risk has been identified. Accordingly, we conclude the Board abused its discretion in issuing the functional equivalent of a negative declaration.

The parties' dispute with respect to this issue centers on the criteria relied upon by the Board to assess whether any alleged impacts on the environment from modifying the regulation are significant. According to the Board, the modifications had no substantial impact under two different analyses. First, when measured against the current output of pollutants, the Board found that implementing the amendments would result in a continual decrease in pollutant output. Thus, at no point would the regulations result in an absolute increase in pollutants. Second, when compared to California's long term air pollution reduction plans, the Board found implementation of the amendments resulted in a slower projected decrease in pollutants but that this slower pace would have no impact on California's ability to meet its 2023 emission goals. Respondents do not directly attack these findings. Rather, respondents contend a fair argument exists that three types of pollutants, oxides of nitrogen, particulate matter, and greenhouse gases, will increase in the short term over the measurements that would have existed had the original

30.

regulations remained in place. Respondents claim these increases are significant, both at a local and statewide level.

Standard of Review and Applicable Law

" 'CEQA excuses the preparation of an EIR and allows the use of a negative declaration when an initial study shows that there is no substantial evidence that the project may have a significant effect on the environment.' " (*Rominger v. County of Colusa* (2014) 229 Cal.App.4th 690, 713 (*Rominger*).) Thus, one of the critical first steps in CEQA "is to determine whether the project *may* have a significant effect on the environment." (*Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, 1106 (*Amador Waterways*); see Pub. Resources Code, § 21082.2, subd. (d).)

As the CEQA Guidelines explain, if "there is substantial evidence, in light of the whole record before a lead agency, that a project may have a significant effect on the environment, the agency shall prepare a draft EIR." (CEQA Guidelines, § 15064, subd. (a).) "An ironclad definition of significant effect is not always possible because the significance of an activity may vary with the setting." (*Id.*, subd. (b).) With respect to greenhouse gases, lead agencies "should consider the following factors, among others, when assessing the significance of impacts from greenhouse gas emissions on the environment: [¶] (1) The extent to which the project may increase or reduce greenhouse gas emissions as compared to the existing environmental setting; [¶] (2) Whether the project emissions exceed a threshold of significance that the lead agency determines applies to the project[;] [¶] (3) The extent to which the project complies with regulations or requirements adopted to implement a statewide, regional, or local plan for the reduction or mitigation of greenhouse gas emissions. . . . If there is substantial evidence that the possible effects of a particular project are still cumulatively considerable notwithstanding compliance with the adopted regulations or requirements, an EIR must be prepared for the project." (CEQA Guidelines, § 15064.4, subd. (b).) More generally, agencies are encouraged to develop thresholds of significance to use in determining

31.

whether a project has significant environmental effects. "A threshold of significance is an identifiable quantitative, qualitative or performance level of a particular environmental effect, non-compliance with which means the effect will normally be determined to be significant by the agency and compliance with which means the effect normally will be determined to be less than significant." (CEQA Guidelines, § 15064.7, subd. (a).)

Despite the encouragement to develop thresholds of significance and to consider environmental impacts against certain standards, such comparisons "cannot be used to determine automatically whether a given effect will or will not be significant. . . . In each instance, notwithstanding compliance with a pertinent threshold of significance, the agency must still consider any fair argument that a certain environmental effect may be significant." (*Amador Waterways*, *supra*, 116 Cal.App.4th at pp. 1108-1109.) In other words, "[a] lead agency cannot avoid finding a potentially significant effect on the environment by rotely applying standards of significance that do not address that potential effect." (*Rominger*, *supra*, 229 Cal.App.4th at p. 717.) Thus, if one can point to substantial evidence in the record that a project might constitute a significant effect on the environment notwithstanding the agency's applied standard of significance, then the agency cannot avoid its obligation to prepare an EIR by rotely relying on its standard. (*Ibid.*)

In reviewing an agency's decision to adopt a negative declaration, courts utilize the same fair argument test applied by the agency. (*Rominger*, *supra*, 229 Cal.App.4th at p. 713.) "The fair argument standard is met if the agency's initial study of the project produces *substantial evidence supporting a fair argument that the proposed project may have a significant adverse effect on the environment*." (*Citizens for the Restoration of L Street v. City of Fresno* (2014) 229 Cal.App.4th 340, 364.) "The fair argument standard is a low threshold." (*Ibid.*) We review this issue independently. (*Rominger*, *supra*, 229 Cal.App.4th at p. 713.)

<u>The Board Ignored a Fair Argument in this Case</u>

In challenging the Board's decision in this case, respondents needed "to ' "demonstrate by citation to the record the existence of substantial evidence supporting a fair argument of significant environmental impact." ' " (*Rominger*, *supra*, 229 Cal.App.4th at p. 727.) With respect to oxides of nitrogen, particulate matter, and greenhouse gases, respondents point to specific data in the initial statement showing that each would increase across California under the amended regulations when compared to the then-existing regulations. Respondents further point to evidence the increases identified are significant on a statewide basis and with respect to specific geographical areas.[4]

The Board does not directly tackle these alleged increases in its briefing.[5] Rather, in its opening brief, the Board recognizes that it found emissions are projected to decline at a slower pace between 2015 and 2017, with the overall decrease being nearly identical by 2018. It then concedes, "this comparison *could* show the potential for a lower rate of reductions, and thus, an unrealized emissions benefit," before, without citation to the

---

[4]     For oxides of nitrogen, respondents point to evidence the change will increase emissions by five tons per day in 2014 and 21 tons per day in 2017. Respondents compare these figures to the significance standard of 10 tons per year for projects in the San Joaquin Valley and claim they would constitute over 2 percent of statewide on-road mobile sources of emissions in 2017. For particulate matter, respondents compare a 1.1 ton per day increase in 2017 with the 15 ton per year significance standard in the San Joaquin Valley and claim the increase could account for 1.4 percent of statewide on-road motor vehicle emissions. For greenhouse gases, respondents focus on black carbon emissions and argue the short term increase identified is nearly 1 percent of the statewide daily greenhouse gas inventory.

[5]     The initial statement does seem to consider a five ton per day increase in oxides of nitrogen in 2017 within the San Joaquin Valley, concluding "emissions would remain at or below the level that would provide for attainment by 2017" resulting in "no expected impact on 1-hour ozone SIP [(State Implementation Plan)] for the San Joaquin Valley." The statement seems to also consider black carbon impacts. However, the Board makes no argument these analyses correspond to respondents' positions or otherwise supports the Board's conduct.

33.

record, arguing "the emissions reductions as projected in 2010 were no longer valid and reliable to use as a baseline in 2014."  In reply, it further attempts to tie its baseline determination to the significance issue by arguing that "in erroneously finding [the Board] used the incorrect baseline, the trial court improperly found a 'fair argument.' " (Boldface & some capitalization omitted.)  Ultimately, the Board's argument is that the evidence supports the Board's "finding of no significant impacts because the 2014 amendments result in the same emissions reductions in 2023 allowing California to meet its State Implementation Plan, which is the primary objective of the Truck and Bus Regulation."

As noted above, the Board cannot simply rely on its settled baseline determination and factors of significance in the face of substantial evidence the project might have a significant impact on the environment.  (*Rominger*, *supra*, 229 Cal.App.4th at p. 717.)  While the Board could reasonably rely on either the direct reduction in emissions or the ultimate compliance with California's air pollution reduction goals when conducting its initial study (see *Center for Biological Diversity*, *supra*, 62 Cal.4th at p. 223), its reliance on these significance standards did not alleviate it from its obligation to proceed further if respondents identified evidence in the record suggesting the project may significantly impact the environment under different standards.

Here, we find respondents did just that.  Although respondents raise the issue in the context of determining a proper baseline, they correctly note that under the CEQA Guidelines the Board is obligated to discuss "inconsistencies between the proposed project and applicable general plans, specific plans and regional plans," including the State Implementation Plan (reflecting the state's long-term air pollution reduction goals) and plans for the reduction of greenhouse gas emissions in any EIR's generated.  (CEQA Guidelines, § 15125, subd. (d).)  In its initial statement, the Board provides information regarding such a comparison, although it finds no inconsistency in the long term.  It is this same evidence that respondents cite to for their "fair argument."  While the Board

34.

may disagree with the conclusions drawn by respondents regarding the short- to medium-term impacts, the evidence is sufficient to require the Board to make that disagreement public through the equivalent of an EIR, where such a comparison is generally required. (See *Neighbors*, *supra*, 57 Cal.4th at p. 455 ["Though we might rationally choose to endure short- or medium-term hardship for a long-term, permanent benefit, deciding to make that tradeoff requires some knowledge about the severity and duration of the near-term hardship."].)  The Board's failure to acknowledge and act upon this fair argument violated CEQA.

## *Contentions Under the APA*

Although we find the modified regulations cannot stand under CEQA, the parties also dispute whether the Board properly complied with the APA's provisions regarding the need to assess certain potential adverse economic impacts arising from the modifications.  The trial court found the Board did not proceed according to the APA's requirements in conducting its analysis and responding to community comments.  We reach this issue because proper compliance with the APA will be required should the Board further pursue regulatory modifications.  On this point, we received amicus briefing from a coalition of 10 business and industry organizations interested in the proper application of the APA's economic impact analysis requirements.[6]

### *Relevant APA Principles*

Born from a perception that " 'there existed too many regulations imposing greater than necessary burdens on the state and particularly upon small businesses,' " the APA provides a procedural vehicle to review proposed regulations or modifications thereto in order to " 'advance "meaningful public participation in the adoption of administrative

---

[6]     Amici have requested we take judicial notice of certain legislative documents reflecting the intent and purpose behind enacting the APA.  The Board opposed taking notice of these documents and we deferred ruling on the request.  Because we do not ultimately rely on the contested documents, we deny the motion as moot.

35.

regulations by state agencies" and create "an administrative record assuring effective judicial review." ' " (*Western States Petroleum Assn. v. Board of Equalization* (2013) 57 Cal.4th 401, 424-425 (*Western States*).) In other words, the APA establishes basic minimal procedural requirements for rulemaking in California. (*POET I*, *supra*, 218 Cal.App.4th at p. 743.) "Pursuant to those procedural requirements, agencies must, among other things, (1) give the public notice of the proposed regulatory action; (2) issue a complete text of the proposed regulation with a statement of reasons for it; (3) give interested parties an opportunity to comment on the proposed regulation; (4) respond in writing to public comments; and (5) maintain a file as the record for the rulemaking proceeding." (*Id.* at pp. 743-744.)

As part of the initial disclosures required under step two, a rulemaking agency "must include '[f]acts, evidence, documents, testimony, or other evidence on which the agency relies to support an initial determination that the action will not have a significant adverse economic impact on business.' " (*Western States*, *supra*, 57 Cal.4th at p. 425.) The agency's initial statement is followed by a public comment period, after which, "if the agency decides to enact the regulation, it must prepare a 'final statement of reasons' for adopting the proposed rule, which must include '[a]n update of the information contained in the initial statement of reasons.' " (*Id.* at p. 426.) This final statement "must also include '[a] summary of each objection or recommendation made regarding the specific adoption, amendment, or repeal proposed, together with an explanation of how the proposed action has been changed to accommodate each objection or recommendation, or the reasons for making no change.' " (*Ibid.*) This aspect of the procedures is referred to as the economic impact assessment requirement. (*Id.* at p. 425.)

Looking at this requirement more granularly, under Government Code section 11346.5, subdivision (a)(8), "If a state agency, in adopting, amending, or repealing any administrative regulation, makes an initial determination that the action will not have a significant, statewide adverse economic impact directly affecting business, including the

ability of California businesses to compete with businesses in other states, it shall make a declaration to that effect in the notice of proposed action." Similarly, under Government Code section 11346.3, subdivision (a), "A state agency proposing to adopt, amend, or repeal any administrative regulation shall assess the potential for adverse economic impact on California business enterprises and individuals, avoiding the imposition of unnecessary or unreasonable regulations or reporting, recordkeeping, or compliance requirements." This section requires the agency to "prepare a standardized regulatory impact analysis," that "shall address" several factors including the "creation or elimination of jobs within the state," the "creation of new businesses or the elimination of existing businesses within the state," and the "competitive advantages or disadvantages for businesses currently doing business within the state." (*Id.*, subd. (c)(1).)

An agency's initial determination " 'need not be conclusive, and the qualifying adjective "significant" indicates that the agency need not assess or declare *all* adverse economic impact[s] anticipated.' " (*Western States*, *supra*, 57 Cal.4th at p. 428.) Similarly, "an agency's initial determination of economic impact need not exhaustively examine the subject or involve extensive data collection. The agency is required only to 'make an initial showing that there was some factual basis for [its] decision.' " (*Id.* at p. 429.) Indeed, "a regulation will not be invalidated simply because of disagreement over the strict accuracy of cost estimates on which the agency relied to support its initial determination." (*Ibid.*) Once the initial assessment is complete, "affected parties may comment on the agency's initial determination and supply additional information relevant to the issue." (*Ibid.*) The agency "must respond to the public comments and either change its proposal in response to the comments or explain why it has not." (*Ibid.*)

*Standard of Review*

We review the Board's "initial determination to determine that the [Board] has substantially complied with its obligations, and whether it is supported by some substantial evidence." (*California Assn. of Medical Products Suppliers v. Maxwell-Jolly*

37.

(2011) 199 Cal.App.4th 286, 307.) Interpreting the relevant statutes to determine whether the Board has substantially complied with its obligations is a question of law to which we apply an independent standard of review. (*POET I*, *supra*, 218 Cal.App.4th at p. 748.)

In its briefing, the Board argues "[t]he standard of review for a purely procedural APA claim is not precisely clear" and, relying primarily on *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1 (*Yamaha*), argues its conduct fell within its regulatory and rulemaking authority and thus is subject to a deferential review where we accord the Board's decisions great weight and respect. Although there are circumstances where such a standard of review is applicable to the Board's conduct, it is not in review of APA procedural compliance issues. Indeed, we held so definitively in *POET I*, *supra*, 218 Cal.App.4th at pages 747-748, where we rejected this same argument and reliance on *Yamaha*. Contrary to the Board's arguments in response to amici, *POET I* is not distinguishable simply because it dealt specifically with rules relating to maintaining the record file during rulemaking. As we noted in *POET I*, the procedures set forth in chapter 3.5, article 5 of the APA, which include not only the rulemaking file requirements but all the contested provisions in this case, govern "the adoption and amendment of regulations by state agencies" and "establish[] 'basic minimum procedural requirements' for rulemaking," the violation of which may result in the regulation being declared invalid. (*POET I*, *supra*, 218 Cal.App.4th at pp. 743-744.) Our conclusion in *POET I*, that we independently review and interpret the procedural requirements of the APA, controls.

We further note this conclusion comports with our Supreme Court's precedent in *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 576-577, and *Armistead v. State Personnel Board* (1978) 22 Cal.3d 198, 204-205. Both of those cases explained that an agency's decision to include non-APA compliant interpretations of legal principles in its regulations will not result in additional deference to the agency.

Here, the Board claims its economic analysis resulted from its interpretation of how the APA's analytical process should be conducted—i.e. that the Board need only consider whether California companies will be harmed vis-à-vis competition with out-of-state companies. Although the Board attempts to rely on an approval of its economic analysis from the Department of Finance to claim its interpretation of the APA was proper, it points to no formal regulation supporting its interpretation and, as respondents point out, the record itself provides no indication the Board's interpretation was even conveyed to the Department of Finance when it reviewed the Board's work. Even if within the realm of the Board's authority, which our conclusion in *POET I* demonstrates is not the case, such unstated and undeveloped interpretations do not comply with the APA and are entitled to no deference. (*Tidewater Marine Western, Inc. v. Bradshaw*, *supra*, 14 Cal.4th at p. 576 [" '[T]o give weight to [an improperly adopted regulation] in a controversy that pits [the agency] against an individual member of exactly that class the APA sought to protect . . . would permit an agency to flout the APA by penalizing those who were entitled to notice and opportunity to be heard but received neither.' "].) Ultimately, review here is not fundamentally different from any other set of laws under which the Board must operate when engaged in its rulemaking activities, including CEQA.

*The Board's Conduct Violated the APA*

As detailed above, under the APA's economic analysis requirements, the relevant agency must consider whether the regulation will have a significant statewide adverse economic impact directly affecting business. The Board's argument in support of its economic analysis under this standard centers on accepting the premise that the Board "interpreted this provision as requiring an analysis of the competitiveness of the whole California trucking industry relative to the industry outside the state." The Board contends it had no obligation under the APA to extend its analysis further, in part because the evidence offered of harm to certain trucking fleets was "speculative, and expressed

the general sentiment that the truck fleets that had already complied would be at a financial disadvantage as compared to the truck fleets that had not yet complied."

We do not agree with the Board that the economic impact analysis requirements are so narrowly drawn. Nothing in the language of the relevant statutes suggests the economic interests relevant to the APA analysis are solely inter-state interests. Government Code section 11346.5 broadly requires consideration of "significant, statewide adverse economic impact[s] directly affecting business." (*Id*., subd. (a)(8).) While it then references inter-state impacts, it does so by adding them to the required analysis rather than limiting the analytical scope. (*Ibid*. ["including the ability of California businesses to compete with businesses in other states"].) Likewise, Government Code section 11346.3 requires an analysis of several factors that are broadly drafted in a manner which does not suggest solely inter-state impacts, such as the "creation of new businesses or the elimination of existing businesses within the state," and the "competitive advantages or disadvantages for businesses currently doing business within the state." (*Id*., subd. (c)(1).) This later provision strongly suggests the Board must look at each type of business subject to the relevant proposals and consider whether those proposals will advantage or disadvantage that particular type, despite the source of those impacts being advantages the regulations bring to other in-state businesses. Finally, the APA's general purpose of relieving stress on small businesses subject to unnecessary regulation further supports a broad reading of the required analysis. The desire to relieve burdens on small businesses necessarily entails a consideration of how those small businesses are impacted by regulations relative to larger in-state businesses that will not feel the impact of such regulations at the same scale. We therefore conclude the Board was not permitted under the statutory scheme to ignore evidence of impacts to specific segments of businesses already doing business in California from benefits to other in-state businesses when proceeding under the APA. If the Board's proposed regulatory

40.

amendments placed the state's thumb on the scale for one group of in-state businesses over another, it needed to consider that impact.

Notably, the Board's discussions in the relevant documents appear to recognize this requirement, despite its current arguments on appeal. When discussing expected changes in costs for particulate matter filter upgrades for heavier trucks, the initial statement explained "[l]ong-haul trucking fleets that are based in California or outside California do not compete in the same markets as vocational trucks and are affected differently because of their business model and type of truck used." Likewise, the initial statement, when discussing changes in costs for long-haul fleets, explained there may be potential differences in impact between large and small fleets, "fleet owners that have acted early or have downsized, and owners that cannot afford to comply." The initial statement also included a separate discussion of impacts on small businesses and took the time to recognize, although not analyze, the fact that there needed to be a balancing between the needs of compliant and non-compliant fleets.

We further recognize that evidence of in-state effects between compliant and non-compliant fleets was presented to the Board in the form of testimonials provided by impacted businesses. These testimonials informed the Board that significant expenditures had been required to comply with the previous compliance deadlines, that non-compliant fleets without those additional expenses were therefore able to undercut compliant fleets on pricing, and that providing additional time for those non-compliant fleets to meet the relevant standards under the modified regulations could result in substantial harm to some of those businesses, including bankruptcy. Such evidence is not mere speculation and in similar contexts, specific testimonial evidence from the public has been readily identified as substantial evidence supporting the need for a response. (See *Architectural Heritage Assn. v. County of Monterey* (2004) 122 Cal.App.4th 1095, 1117-1118 [discussing relevant evidence in CEQA fair argument context to include public testimony].) Accordingly, regardless of whether the Board was aware of such

41.

impacts at the time it made its initial report, it was made aware of them through the proper procedural mechanism of public comment and, as such, had an obligation to respond under the APA. (See *Western States*, *supra*, 57 Cal.4th at p. 429 [explaining that, upon provision of proper comments from public, agency "must respond to the public comments and either change its proposal in response to the comments or explain why it has not"].)

The Board's responses to this evidence were insufficient under the APA. Although the Board appeared to respond to the comments received, its responses were not supported by any record evidence. For example, the Board alleged that it had considered issues of fairness and structured provisions in the modifications accordingly. Yet it argues the exact opposite on appeal—that it did not consider intra-state competition—and we have been pointed to no analysis in the administrative record showing the Board actually analyzed such impacts and acted in light of these concerns. As the APA requires the Board to explain why it chose not to make changes in the face of substantial evidence of impacts, unsupported assertions the evidence—neither actually collected nor reviewed by staff—was considered in drafting the regulations simply cannot satisfy the APA. In failing to properly respond to the comments regarding intra-state competition issues, the Board failed to abide by its obligations under the APA in either form or substance.

## DISPOSITION

The judgment is affirmed.  Costs on appeal are awarded to respondents.

_____

DETJEN, J.

WE CONCUR:


_____

LEVY, Acting P.J.


_____

POOCHIGIAN, J.